## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

**Civil Action No. 21-cv-2340**

CHRISTOPHER TANNER, an individual,

      Plaintiff,

v.

ZACHARY A. CAMPBELL, NP, individually;
JILL M. MANNON, individually;
ALLA SHKOLNIK, individually;
DORA MOLINA, RN, individually;
ELEANA A. FLORES, individually;
RANDOLPH MAUL, MD, individually;
TINA CULLEYFORD, HSA, individually;

      Defendants.

---

### CIVIL RIGHTS COMPLAINT WITH REQUEST FOR TRIAL BY JURY

---

Plaintiff, by and through his attorneys of HOLLAND, HOLLAND EDWARDS & GROSSMAN, LLC and THOMAS KEEL & LAIRD, LLC, complain against Defendants and request a trial by jury as follows:

## I.      INTRODUCTION

1.      Christopher Tanner was a 45-year-old inmate at the Denver Reception and Diagnostic Center ("DRDC") who was abandoned in a known medical crisis by involved Defendants, culminating in his finally being transferred to the hospital near death. While hospital staff were able to save his life, he suffered significant illness and ultimately lost most of his fingers and toes and portions of his hands and his feet.

2.      Mr. Tanner suffered these permanent, disabling injuries because he was denied timely care for a bacterial pneumonia, which could have been treated. Instead, his pneumonia progressed into sepsis and ultimately septic shock. Had Defendants not been deliberately indifferent to his obvious dire medical needs, Mr. Tanner would still have his hands and feet.

## II.      JURISDICTION AND VENUE

3.      This action arises under the Constitution and laws of the United States, including Article III, Section 1 of the United States Constitution and 42 U.S.C. § 1983 and 42 U.S.C. § 1988. The Jurisdiction of this Court is further invoked pursuant to 28 U.S.C. §§ 1331, 1343, 2201 and 2202.

4.      This case is instituted in the United States District Court for the District of Colorado pursuant to 28 U.S.C. §1391 as the judicial district in which all relevant events and omissions occurred and in which Defendants maintain offices and/or reside.

## III.      PARTIES

5.      At all times relevant hereto, Plaintiff Christopher Tanner was a resident of the State of Colorado and a citizen of the United States of America.

6.      At all times relevant hereto, Zachary A. Campbell, NP was an employee of CDOC working at DRDC and a resident of Colorado and citizen of the United States of America. This Defendant was responsible for providing medical care to Plaintiff during his detention.  At all material times, this Defendant was acting under color of state law.

7.      At all times relevant hereto, Jill M. Mannon, NP was an employee of CDOC working at DRDC and a resident of Colorado and citizen of the United States of America. This Defendant was

responsible for providing medical care to Plaintiff during his detention. At all material times, this Defendant was acting under color of state law.

8.     At all times relevant hereto, Alla Shkolnik, NP was an employee of CDOC working at DRDC and a resident of Colorado and citizen of the United States of America. This Defendant was responsible for providing medical care to Plaintiff during his detention. At all material times, this Defendant was acting under color of state law.

9.     At all times relevant hereto, Dora Molina, RN was an employee of CDOC working at DRDC and a resident of Colorado and citizen of the United States of America. This Defendant was responsible for providing medical care to Plaintiff during his detention. At all material times, this Defendant was acting under color of state law.

10.     At all times relevant hereto, Eleana A. Flores was an employee of CDOC working at DRDC and a resident of Colorado and citizen of the United States of America. This Defendant was responsible for providing medical care to Plaintiff during his detention. At all material times, this Defendant was acting under color of state law.

11.     At all times relevant hereto, Randolph Maul, M.D. was an employee of CDOC working at DRDC and a resident of Colorado and citizen of the United States of America. This Defendant was responsible for providing and arranging medical care to Plaintiff during his detention. At all material times, this Defendant was acting under color of state law.

12.     At all times relevant hereto, Tina Culleyford, HSA was an employee of CDOC working at DRDC and a resident of Colorado and citizen of the United States of America. This Defendant was responsible for providing and arranging for medical care to Plaintiff during his detention.  At all material times, this Defendant was acting under color of state law.

## IV.   STATEMENT OF FACTS

13.     In January of 2020, Mr. Tanner, then 45 years old, entered the Colorado Department of Corrections, and was housed at the Denver Diagnostic and Reception Center.

14.     DRDC is generally used as a transitional facility to assess and classify prisoners as they come into the prison system.  DRDC also has some permanently assigned prisoners who have special medical needs.

15.     DRDC has more medical capabilities than other CDOC facilities.

16.     At the time he was admitted to CDOC, Mr. Tanner was weaned off methadone, a treatment for an opiate use disorder, and placed on Suboxone, another treatment for opiate use disorder.

17.     Mr. Tanner was eligible for parole in spring 2020. Given his short sentence and his need for monitoring while on Suboxone, he was housed at DRDC.

18.     After finishing the transition to Suboxone, Mr. Tanner was without significant medical complaints.

19.     It appears from the medical record that Mr. Tanner had a productive cough in February because he was prescribed Mucinex, however there is no note.

20.     On the morning of March 14, 2020, Mr. Tanner woke up with a splitting headache, a much worse cough, and body aches, all of which lasted throughout the day.

21.     That evening Mr. Tanner left a message for his wife telling her that he felt like he had the flu, had a terrible headache and felt very sick.

22.     At about 3:00 am on the morning of the 15th Mr. Tanner woke up feeling extremely hot. He laid on the concrete floor of his cell to cool off and began vomiting.

23.     Shortly thereafter Mr. Tanner lost consciousness.

24.     Michael Sferrazza, Mr. Tanner's cellmate, called for first responders and tried multiple times to get medical attention for Mr. Tanner, who was clearly very ill.

25.     Mr. Sferrazza repeatedly pushed the call button in the cell, banged on the glass, and yelled out that Mr. Tanner needed to go to the hospital and that he was dying.

26.     Sometime between approximately 3:00 and 6:00 am on March 15, 2020, a medical worker apparently assessed Mr. Tanner, although this interaction is not recorded in Mr. Tanner's medical record.

27.     Mr. Tanner's alarming condition was also apparently conveyed to Defendant NP Jill Mannon Keegan (hereinafter referred to by last name Mannon), who then ordered several diagnostic lab tests, including a urinalysis, a CBC and a complete metabolic panel at approximately 6:00 am.

28.     NP Mannon made no notes about his condition at the time and did not record any vital signs.

29.     NP Mannon ordered these tests "STAT" meaning that the order was to be carried about immediately.

30.     Labs are ordered STAT when a provider knows that delay in receiving the ordered information poses an unreasonable risk of harm to the patient. Despite this order, however, the labs were not sent "STAT."

31.     Mr. Tanner was not moved to the medical unit or otherwise observed for the next several hours.

32.     Despite NP Mannon ordering the labs STAT, Defendant LPN Alla Shkolnik did not collect specimens until approximately 8:30 am – nearly three hours later.

33.     When Ms. Shkolnik arrived at Mr. Tanner's cell to collect the ordered blood and urine samples, she found him red and sweating and on the floor of his cell.

34.     Mr. Tanner told Ms. Shkolnik he was sick and "feels like he's going to die."

35.     Mr. Tanner reported to her that he had had a severe headache all day the day before, that he woke up around 3:00 am "because he was so hot, he layed [sic] on the concrete floor and then started throwing up," and that his cellmate had called for first responders because he had lost consciousness.

36.     Ms. Shkolnik repeatedly accused Mr. Tanner of having taken illegal drugs, disregarding his reported symptoms and instead baselessly concluding Mr. Tanner was faking or responsible for his own illness.

37.     At approximately 8:30 am, Ms. Shkolnik found that Mr. Tanner had an elevated pulse, elevated respirations, very low oxygen saturations between 87 and 88%, and an extremely high temperature of 105.8.

38.     A temperature of 100.4 or higher is considered a fever. All reasonable health care workers know that adults with a temperature over 103 F should be monitored, and that if a fever reaches 105 or is accompanied by severe headache or vomiting, immediate medical attention outside the prison's capabilities is required.

39.     All reasonably trained health care workers are aware that a fever of 105.8 is extremely high in an adult man and, especially in combination with vomiting, severe headache,

and other abnormal vital signs, likely indicates a significant bacterial infection that requires higher level evaluation and treatment than can't be provided in the prison.

40.     In an addendum authored the next day on March 16, 2020, Ms. Shkolnik recorded that at approximately 8:30 on the morning of the 15th, Mr. Tanner's oxygen saturation levels were dangerously low at 87-88% on room air and that Mr. Tanner was put on 1L of O2 via nasal canula.

41.     All reasonably trained health care workers are aware that it is an emergent symptom for Mr. Tanner not to be able to maintain oxygenation saturation in his blood.

42.     Any reasonably trained caregiver knows that an otherwise healthy person who cannot maintain oxygen saturations is in a critical medical condition. That Mr. Tanner couldn't not maintain adequate oxygenation *even with* supplemental oxygen underscored that he was in a medical crisis.

43.     Despite obtaining multiple abnormal vitals, including very high temperatures, high pulse, fast respirations, and very low pulse oxygenation, Ms. Shkolnik charted Mr. Tanner's breathing was "adequate for rate and depth."

44.     Ms. Shkolnik apparently conveyed the abnormal vital signs to NP Mannon, who ordered IV fluids and two (2) tablets of 500mg Acetaminophen by mouth three times daily as needed.

45.     NP Mannon knew that over-the-counter pain medicine could never treat, let alone cure, any underlying condition for these symptoms.

46.     Any reasonably trained care giver knows that IV fluids will not treat the cause of an infection or sepsis.

47.     Ms. Shkolnik administered Mr. Tanner's blood draw and IV at approximately 9:00 am in his cell.

48.     Ms. Shkolnik instructed Mr. Tanner he would have to hold his own IV bag, and "educated" him to "stop drinking coffee and drink water."

49.     While Mr. Tanner was being given IV fluids on the morning of March 15th, he was very nauseated and "started to dry heave after IV started."

50.     Mr. Tanner also had a significant mental status change during this period.

51.     While the blood draw and IV were being administered, Mr. Tanner became lethargic to the point that Ms. Shkolnik had to use a sternal rub to arouse him.

52.     A sternal rub is a pain technique employed to assess the consciousness level of a patient who is not responding to verbal stimuli or to arouse a person who cannot otherwise be aroused.  It is sometimes used in correctional contexts to test if a person is exaggerating their level of unconsciousness, as the pain of a sternal rub would likely cause a person whose faking their unconsciousness to respond.

53.     Any reasonably trained caregiver knows that a man with these vital signs who passes out multiple times and has to be revived with a pain technique is in a medical crisis and needs to be transferred to the hospital immediately.

54.     However, after obtaining these alarming vitals, administering the IV fluids and blood draw, and performing a sternal rub to arouse Mr. Tanner, Ms. Shkolnik simply left him in his cell for hours.

55.     Ms. Shkolnik returned at approximately 11:00 am, removed Mr. Tanner's supplemental oxygen for four minutes, and charted that his saturation quickly dropped critically low to 87-88%.

56.     Mr. Tanner's abnormal vital signs and condition were also apparently conveyed to Dr. Randolph Maul, who ordered that Mr. Tanner and Mr. Sferrazza receive COVID tests but did not make any orders to send Mr. Tanner to the hospital.

57.     Mr. Tanner and Mr. Sferrazza (who was not sick and did not become sick on March 14, 15, or 16, 2020) were placed on isolation protocols together in their cell and tested for COVID.

58.     Throughout the remainder of March 15, 2020, Mr. Tanner continued to decline.

59.     Mr. Sferrazza, who was then the only person observing Mr. Tanner's status, was very concerned as it was obvious that Mr. Tanner's condition was severe and worsening.

60.     Mr. Sferrazza, concerned about both his own health given the suspicion Mr. Tanner had COVID, and about Mr. Tanner, had another inmate make a call on his behalf and read a letter he wrote. In this letter, Mr. Sferrazza stated that Mr. Tanner "woke up with a 105 fever, cold sweats, paleness of skin, throwing up, and headache."

61.     Throughout the day and into the night, Mr. Sferrazza called for help over ten times, by pushing the emergency button in his cell and by declaring a medical emergency, both which, pursuant to CDOC protocol, is supposed to cause a quick reaction from medical staff.

62.     Despite pushing the button or requesting emergency help over ten times, medical staff only responded about three times.

63.     Rather than respond or address the emergency, medical and correctional staff accused Mr. Sferrazza and Mr. Tanner of lying and told them to stop pushing the button.

64. Mr. Tanner was simply left without medical attention the rest of the day on March 15, 2020 and overnight.

65. Throughout this period, Mr. Tanner was in and out of consciousness and repeatedly asked Mr. Sferrazza if he thought he was going to die.

66. Mr. Sferrazza had to help carry Mr. Tanner to get him off the floor.

67. At approximately 10:30 am on March 16th, Defendant Nurse Supervisor Dora Molina assessed Mr. Tanner's condition.

68. Ms. Molina charted that Mr. Tanner was "sitting hunged [sic] over in a chair upon arrival to cell room" and that he became diaphoretic about 45 minutes after she arrived.

69. Mr. Tanner reported that for two days he had been experiencing a productive cough, difficulty breathing, body aches, loss of appetite, and pain to his right mid to posterior ribcage.

70. Ms. Molina reported to Defendant NP Zachary Campbell that Mr. Tanner was not doing well, that he was feeling poorly, and had diminished lung sounds.

71. NP Campbell knew that Mr. Tanner clearly needed higher-level evaluation and care than CDOC could provide, but still chose not to evaluate Mr. Tanner due to "concern for COVID-19 and exposure in staff and clinic."

72. Mr. Tanner did not have COVID, but even if it was COVID that was causing this medical emergency, it was a medical emergency that required immediate hospitalization.

73. CDOC lacks the capacity to treat Mr. Tanner's medical emergency regardless of the cause, and especially here, given that medical defendants expressly acknowledge their inability to even have a provider assess Mr. Tanner due to their COVID concerns.

74. Despite the known critical signs in this patient, NP Campbell, Ms. Molina, and

Defendant Health Services Administrator (HSA) Tina Culleyford jointly decided to keep Mr. Tanner onsite, "defer provider assessment," and follow-up in two hours.

75.     As of March 16, 2020, NP Campbell was aware that low oxygen poses a risk of serious bodily injury if not addressed.

76.     Understanding the extreme risk low oxygenation posed Mr. Tanner, NP Campbell charted "make sure patient has oxygen on."

77.     When Ms. Molina returned to assess Mr. Tanner again at approximately 12:40 pm his "oxygen was not in place."

78.     At that time, Mr. Tanner's saturation levels were critically low at 86% on room air.

79.     Ms. Molina charted that Mr. Tanner's blood pressure had dropped precipitously to 96/64, and that and his pulse and respirations were elevated. His lung sounds were diminished to the left and absent in the right.

80.     At around 12:40 pm on March 16, 2020, Ms. Molina again conveyed Mr. Tanner's alarming symptoms and vital signs to NP Campbell.

81.      Although it was obvious that Mr. Tanner had been in the throes of a medical emergency requiring higher level assessment and care than could be provided at DRDC for over a day, NP Campbell again chose to keep Mr. Tanner onsite and provide minimal intervention, ordering only that Mr. Tanner receive an albuterol nebulizer and oxygen.

82.     NP Campbell knew it was necessary to take an x-ray of Mr. Tanner's lungs but "[d]iscussed with Tina HSA to continue to defer having patient come to clinic for x-ray" due to COVID concerns.

83.     HSA Tina and NP Campbell arranged to have a portable x-ray done in the multipurpose room.

84.     Given the medical capabilities of DRDC, Mr. Tanner was far past the point where diagnostic tests in prison (whatever they would show) were sufficient as he was unable to maintain enough oxygen for his body and he needed to be in the hospital.

85.     By about 2:20 pm, even after nebulizer treatment, Mr. Tanner's oxygen saturation levels "continue[d] to linger between 77% - 82%."

86.     Ms. Molina then started Mr. Tanner on a non-rebreather mask, a higher-level oxygen delivery device than the nasal canula, which she turned up to 15 liters of oxygen.

87.     Mr. Tanner's "oxygen saturation [would] not go above 85%," even with the non-rebreather mask.

88.     At 2:42 pm, nearly 36 hours after Mr. Sferrazza had first called out for emergency medical attention, NP Campbell, Dr. Maul, and HSA Tina finally arranged for Mr. Tanner's emergent transport to the hospital.

89.     As Mr. Sferrazza noted contemporaneously on March 16, 2020, medical staff at CDOC did not want to take him to the hospital and only agreed to do so when it was too late, and their conduct led to Mr. Tanner being much sicker than he should have been.

90.     First responders charted that Mr. Tanner's chief complaint was respiratory distress, and that, he had had a fever of "105 last PM, today fever at 99.9. PT this AM became SOB and hypoxic at 83x15L x non-rebreather, increased to 25L."

91.     The paramedics noted Mr. Tanner was diaphoretic and pale.

92.     The paramedics concluded his condition was "emergent."

93.     Transport personnel communicated to the emergency room staff that Mr. Tanner "had a T max of 105 degrees in medical isolation in prison last night. Was hypoxic and tachycardic during transport and received O2."

94.     By the time he arrived at the Emergency Department at UCHealth Anschutz, Mr. Tanner was in respiratory failure and severe septic shock. He was also gravely hypotensive. Additionally, his pulse and respirations were elevated, and his oxygen saturation remained dangerously low at just 80%.

95.     Mr. Tanner was admitted to UCHealth with "severe septic shock with respiratory failure" due to strep and MRSA pneumonia.

96.     UCHealth doctors administered life saving measures, including iv fluids, iv antibiotics, and pressors.

97.     During his stay at UCHealth from March 16, 2020 to April 8, 2020, Mr. Tanner suffered stress cardiomyopathy, limb ischemia with extensive digital necrosis, recurrent hospital-acquired pneumonia, and acute renal failure. His pneumonia ultimately resolved after two course of extensive spectrum antibiotic treatment. He required oxygen throughout his admission. He required dialysis, among other treatments, for his renal failure. He developed stress cardiomyopathy and a Type II myocardial infarction due to septic shock, among other significant health problems.

98.     As of March 18, 2020, DRDC had not yet informed Mr. Tanner's wife of his condition or his transfer to UCHealth.

99.     According to UCHealth, as of March 18, 2020, "per correctional Health pt's wife can be informed, however she cannot visit until permission is given by the Warden." Likewise,

according UCHealth, as of March 18, 2020, DRDC care management emphasized "Pt is a ward of the state (DOC patient) and the prison warden will make POC decisions for patient at this time, and critical illness."

100.    As a result of the amount of pressors required to keep him alive, he lost adequate blood flow to his extremities, causing limb ischemia and digital necrosis of his upper and lower extremities.

101.    When Mr. Tanner woke up and regained consciousness after days in the hospital, his hands and feet had turned black. This was shocking and terrifying at the same time, especially since he had not been aware of what was happening, and doctors immediately told him that he had to being prepping for various amputations.

102.    On April 8, 2020, Mr. Tanner was discharged from UCHealth to Kindred Hospital/Aurora for inpatient care, including daily wound care. On discharge, it was noted that Mr. Tanner's "limb ischemia is a major issue and he will need follow up with our vascular surgeons for eventual amputations. He is bedbound with a total assist for all ADLs."

103.    At Kindred, Mr. Tanner received wound care and continued to be followed by wound care, plastic surgery, and vascular surgery at UCHealth.

104.    Mr. Tanner remained at Kindred from April 8th until he was discharged home on May 6, 2020. On discharge, it was noted that Mr. Tanner was "chronically ill appearing, NAD, blackened digits in all extremities."

105.    On May 6, 2020, the same day he was discharged from Kindred, Mr. Tanner presented to UCHealth Plastic and Reconstructive Surgery clinic.

**WARNING: the next pages contain graphic photos of Mr. Tanner's injuries**

106.    The following are photographs taken of Mr. Tanner's right hand at UCHealth Plastic and Reconstructive Surgery clinic on May 6, 2020:

 

107.    The following are photographs taken of Mr. Tanner's left hand at UCHealth Plastic and Reconstructive Surgery clinic on May 6, 2020:

 

108.    The following are photographs taken of Mr. Tanner's right foot at UCHealth Plastic and Reconstructive Surgery clinic on May 6, 2020:

 

109.    The following are photographs taken of Mr. Tanner's left foot at UCHealth Plastic and Reconstructive Surgery clinic on May 6, 2020:

 

110.    While at the hospitals/facilities, since it was the beginning of the Pandemic, Mr. Tanner was not allowed visitors. He had to get his head around the fact that the doctor would be surgically cutting off parts of his body, and there was no one there with him. He received the news of his condition alone, went into surgery alone, woke up from anesthesia alone, and suffered the initial pain of recovery alone. Not having anyone during this time caused a great deal of anxiety and depression, and he began anti-depressants.

111.    Because of Defendants' deliberate indifference to Mr. Tanner's needs, specifically his condition on March 14, 15, and 16, 2020, Mr. Tanner ultimately underwent amputations on all four of his extremities, including bilateral TM amputations on his legs/feet, amputations of his left hand at his wrist joint, and multiple finger amputations on his right hand.

112.    Between March 14, 2020, when Mr. Tanner began complaining of headache, cough, and serious fever, and when he was finally sent to the hospital around 2:42 pm March 16, 2020, Mr. Tanner's condition required prompt assessment and treatment at a hospital. However, throughout this time, Defendants did not provide such timely or proper assessment and treatment.

They simply ignored him or attempted at times to manage rather than evaluate his symptoms, as he got worse and worse.

113.     Likewise, Mr. Tanner's initial complaints of feeling ill were disregarded and falsely attributed to drug use for which he showed no signs. Indeed, despite having a fever reaching 105.8, the only "education" he was provided was to "stop drinking coffee and drink water." When it was determined that he should be on IV fluids on March 15, 2020, CDOC and/or DRDC staff made Mr. Tanner hold his own IV bag up, despite his condition.

114.     At all times relevant hereto, CDOC did not have nursing protocols relating to reacting to Mr. Tanner's critical vital signs, such as one for febrile inmates or suspected sepsis.

115.     As a result of the combined deliberate indifference of these individual defendants and associated significant delay in transfer to the hospital, Mr. Tanner has suffered significant pain and suffering, loss of limb, lost earnings capacity, and significant permanent disability.

116.     Mr. Tanner spent months healing and initially needed assistance with almost everything. His wife, Debby, took care of daily wound care, showers, transfers in and out of his wheelchair or bed, everyday grooming, cooking, cleaning, and working outside the home.

117.     While Mr. Tanner has gained some independence, being this dependent has made him feel guilty, depressed and frustrated. Life will never be like it once was, and he began talking anti-depressants to deal with his PTSD, depression, and generalized anxiety.

118.     Physically, Mr. Tanner continues to deal with pain that doesn't seem to ever improve. He is currently consulting with surgeons about exploring the option of going back in for more surgeries to have his feet completely removed -- the hope being that he might be able to get better prosthetics, have less pain, better balance, and not be reliant on a wheelchair for mobility.

119.    Mr. Tanner and his wife are struggling to make ends meet. He had a job offer as part of his parole plan, and was looking forward to going back to surveying and drafting, which was the field he worked in for nearly 20 years. Now, due to his limitations, he will not be able to manage the physical requirements of that kind of position.

120.    Mr. Tanner's entire world is smaller, and he has to teach himself new ways to do everything, both physically and emotionally, in every single aspect of his life.

## V.  CLAIM FOR RELIEF
### Violation of 42 U.S.C. § 1983: Deliberately Indifferent Medical Care
### (Against All Individual Defendants)

121.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

122.    42 U.S.C. § 1983 provides that:

Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress . . .

123.    Mr. Tanner was a citizen of the United States and Defendants to this claim are persons for the purposes of for purposes of 42 U.S.C. § 1983.

124.    Mr. Tanner had a clearly established right under Eighth Amendment to be free from deliberate indifference and reckless disregard for known serious medical needs.

125.    Mr. Tanner was an inmate at DRDC and thus protected from deliberate indifference to his known serious medical needs by the Eighth Amendment.

126.    All Defendants to this claim, at all times relevant hereto, were acting under color of state law.

127.     Defendants, as willful participants in a joint activity, actually knew of Mr. Tanner's serious medical needs and deteriorating condition and nonetheless, with deliberate indifference, decided not to report the symptoms or provide him with obviously necessary urgent medical care. They did so despite being expressly aware of Plaintiff's known serious medical needs and recklessly disregarding a substantial risk of physical harm and death to Plaintiff.

128.     Defendants continued to act in bad faith and with deliberate indifference to Mr. Tanner's serious medical needs and constitutional rights when they consciously ignored his and his cellmate's repeated requests that he receive medical attention and intentionally denied and/or delayed his access to medical care.

129.     In addition to his personal involvement with Mr. Tanner, Dr. Maul, as Medical Director for the Department of Corrections, was also deliberately indifferent in policy making in that no nursing protocols were in place for high fevers, identification or treatment of sepsis, or respiratory distress.

130.     Each of the Defendants are liable to the Plaintiff for violation of 42 U.S.C. § 1983.

131.     The acts or omissions of Defendants as described herein deprived Mr. Tanner of his constitutional rights and were moving forces and substantial significant contributing proximate causes of Mr. Tanner's injuries and damages.

132.     As a direct result of Defendants' unlawful conduct, Mr. Tanner suffered extreme physical and mental pain and suffering while he was in Defendants' custody as well as since that time.

133.    These intentional actions and inactions of each Defendant intentionally deprived Mr. Tanner of due process and of rights, privileges and liberties secured by the Constitution of the United States of America causing him and his estate damages.

134.    As a proximate result of Defendant's unlawful conduct, Mr. Tanner has suffered injuries and losses, including economic damages in the form of lost past and future wages, diminished earning capacity, past and future medical expenses, and including non-economic damages in the form of loss of constitutional rights, pain, suffering, inconvenience, loss of enjoyment of life, and diminished quality of life and other special damages, all in amounts to be proven at trial.

135.    Plaintiff is entitled to attorneys' fees and costs pursuant to 42 U.S.C. §1988, pre-judgment interest and costs as allowable by federal law.

136.    In addition to compensatory, economic, consequential and special damages, Plaintiff is entitled to punitive damages against individual Defendants, in that the actions were taken maliciously, willfully or with a reckless or wanton disregard of the constitutional rights of Plaintiff.

## VI.    PRAYER FOR RELIEF

Plaintiff prays that this Court enter judgment for the Plaintiff and against each of the Defendants and enter the following relief:

(a)    All appropriate relief at law and equity;

(b)    Economic losses on all claims allowed by law;

(c)     Compensatory and consequential damages, including damages for emotional distress, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

(d)     Punitive damages on all claims allowed by law and in an amount to be determined at trial;

(e)     Attorneys' fees and costs associated with this action, including expert witness fees, on all claims allowed by law;

(f)     Pre- and post-judgment interest at the highest lawful rate; and

(g)     Any further relief that this Court deems just and proper.

**PLAINTIFF REQUESTS TRIAL BY JURY.**

Respectfully submitted this 30th day of August, 2021.

*/s/ Erica T. Grossman*
Erica T. Grossman
Anna Holland Edwards
Dan Weiss
HOLLAND, HOLLAND EDWARDS & GROSSMAN, LLC
1437 High Street
Denver, CO  80218
303-860-1331
erica@hheglaw.com
*Attorneys for Plaintiff*

*/s/ Matthew R. Laird*
Matthew R. Laird
Isobel S. Thomas
THOMAS KEEL & LAIRD, LLC
50 S. Steele Street, Suite 450
Denver, CO 80209
303-372-6130
mlaird@thomaskeel.com
*Attorneys for Plaintiff*