**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

**Civil Action No. 21-cv-2340-CMA-NRN**

CHRISTOPHER TANNER, an individual,

      Plaintiff,

v.

ZACHARY A. CAMPBELL, NP, individually et al;

      Defendants.

---

**PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS**

---

Plaintiff hereby responds to Defendant's Motion, (Doc. #19), as follows:

## I.  INTRODUCTION

Christopher Tanner, at 45 years old, is without most of his fingers and toes and portions of his hands and feet as a result of Defendants' repeated reckless decisions to delay emergency treatment for over 36 hours, despite a fever of almost 106, losing consciousness, and dangerously low oxygen levels. Mr. Tanner's bacterial pneumonia was a treatable condition that would not have cost him such severe and permanent injuries had it not been allowed to ravage his body for two days in front of medical staff.

In seeking dismissal on the pleadings, Defendants cherry pick allegations from the Complaint, asking the Court to ignore plausible allegations and reasonable inferences about their state of mind and to not construe the allegations in Plaintiff's favor. Yet the law requires the Court to do both of those things. Unsurprisingly, defendants in these cases invariably argue that they were attempting to treat the plaintiff, and thus were not

deliberately indifferent. However, Defendants cannot evade liability merely by contesting Plaintiff's allegations. If that were the standard, no civil rights complaint where a medical professional provided any response to a sick person would ever survive dismissal. Defendants are just not entitled to the inferences they seek – specifically that, somehow, a 45-year-old man ended up so sick from pneumonia that he lost much of his limbs despite the surrounding medical team all trying their best to help him. Plaintiff alleged an abandonment and delay of care in a known medical crisis. Such deliberate indifference has been clearly established for years to be unconstitutional. While discovery will undoubtedly lend additional facts to support Plaintiff's claims, such allegations of deliberate indifference are more than enough to survive dismissal at this early stage.

## II.  STANDARD OF REVIEW

As this Court appreciates, [t]he court's function on a rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's Complaint alone is legally sufficient to state a claim for which relief may be granted." *Dubbs v. Head Start, Inc.,* 336 F.3d 1194, 1201 (10th Cir. 2003). The Court must "accept all the well-pleaded allegations of the complaint as true" and "construe them in the light most favorable to the plaintiff." *David v. City & County of Denver*, 101 F.3d 1344, 1352 (10th Cir. 1996). Dismissal should be denied unless the complaint "lacks enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is 'plausible on its face' if the complaint contains sufficient facts for a court to draw an inference that the defendant is liable for the alleged misconduct. *Ashcroft v. Iqbal,* 556 U.S. 662, 679 (2009). While Plaintiff must do

2

more than plead "conclusory statements" and "threadbare recitals" of the law [1] the Supreme Court has rejected a heightened pleading standard for §1983 claims. *Johnson v. City of Shelby,* 574 U.S. 10 (2014). The "plausibility" standard requires that relief must plausibly follow from the alleged facts, not that the facts themselves be plausible. Notably, *Twombly* did not alter "the bedrock principle that a judge ruling on a motion to dismiss must accept allegations as true," nor did it require a showing that the facts are "likely to be true" simply because a defendant asserts qualified immunity. *Robbins v. Oklahoma,* 519 F.3d 1242, 1247 (10th Cir. 2008).

Critically here, raising a qualified immunity defense in a motion to dismiss "subjects the defendant to a more challenging standard of review than would apply on summary judgment." *Sayed v. Virginia*, 744 F. App'x 542, 545-46 (10th Cir. 2018); *Partridge v. Pelle*, No. 17-cv-02941-CMA-STV, 2019 U.S. Dist. LEXIS 34931, at *52 (D. Colo. Mar. 5, 2019) citing *Peterson v. Jensen*, 371 F.3d 1199, 1201 (10th Cir. 2004). As Judge Arguello explained: "In reviewing a motion to dismiss in the context of qualified immunity, a district court should not dismiss a complaint for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.*, at *52. Thus, although Defendants task Plaintiff with pleading every single fact in the complaint, Plaintiff does not carry that burden at this stage: "On a motion to dismiss, the court determines whether the complaint's factual allegations state a plausible constitutional claim, not whether the complaint contains all the necessary factual

---

[1] *Iqbal,* 556 U.S. at 663.

allegations to sustain a conclusion that Defendants violated clearly established law." *Id.*

## III.   STATEMENT OF FACTS

Christopher Tanner was incarcerated at CDOC's Denver Reception and Diagnostic Center in January of 2020 ("DRDC.") Complaint, ¶13. On the morning of March 14, 2020, Mr. Tanner woke up with a splitting headache, cough, and body aches, all of which lasted all day. He left a message for his wife telling her he felt like he had the flu, had a terrible headache, and was very sick. ¶¶ 20-21.

Around 3:00 a.m. on March 15, Mr. Tanner woke up feeling extremely hot, and laid down on the concrete floor of the cell to cool off. He began vomiting, losing consciousness soon after. ¶¶ 22-23. Mr. Tanner's cellmate, Mr. Sferrazza, a lay person, seeing the obvious severity of and the need for medical attention for Mr. Tanner's condition, called for help and tried multiple times to get medical attention by repeatedly pushing the call button, banging on the glass, and yelling out that Mr. Tanner was dying and needed to go to the hospital. ¶¶ 24-25. CDOC documents also show that a medical emergency was declared by Mr. Sferrazza at or before 7:05 a.m. on March 15.

Sometime between approximately 3:00 a.m. and 6:00 a.m. this same day, a medical worker assessed Mr. Tanner, though this interaction is not recorded in his record. ¶ 26. Mr. Tanner's alarming condition was conveyed to NP Mannon, who, recognizing the severity of Mr. Tanner's symptoms and the risk posed to his life without immediate

diagnosis and treatment, then ordered several "STAT"[2] diagnostic tests. ¶ 27. Despite the recognition of Mr. Tanner's serious condition compelling the "STAT" lab order and the declared medical emergency, the labs were not sent "STAT," Mr. Tanner was not moved to the medical unit, and he was not checked on for the next several hours. ¶¶ 30-31.

Rather, disregarding Mr. Tanner's serious, untreated, and undiagnosed condition, and the written STAT order, Defendant Shkolnik did not collect specimens until approximately three hours after they were ordered and did not obtain STAT results. ¶ 32. She found Mr. Tanner red and sweating on the floor of his cell. ¶ 33. He had an elevated pulse and respirations, dangerously low oxygen saturations between 87 and 88%, and a dangerously high temperature of 105.8 degrees. All nurses and doctors know inability to breathe and oxygenate the body as well as a fever of 105.8 in an adult male can cause organ failure, often result from very severe infections.[3] ¶ 38-42. Confirming the obvious risk of serious harm without medical attention, he reported that he "feels like he's going to die." ¶ 34. She also learned that he had a severe headache the day before, that he woke up around 3:00 a.m. "because he was so hot, he layed [sic] on the concrete floor and then starting [sic] throwing up," and that Sferrazza had called for responders because he had passed out from this progressing, untreated, and undiagnosed emergency. ¶ 35.

Despite these serious symptoms, Defendant Shkolnik outrageously and without a

---

[2] A "STAT" order means that the tests were to be completed immediately. ¶ 29. Providers use such orders when they know that a delay in receiving the ordered information poses an unreasonable risk of harm to the patient. ¶ 30.

[3] Someone unable to breathe, oxygenate their body, and/or suffering from a fever of 105.8 alone requires immediate tests and hospitalization. These risks of life-threatening organ failure were obvious given his symptomology. *See also* p. 10, below.

verifiable basis accused Mr. Tanner of having taken unspecified illegal drugs. ¶ 36. She thus disregarded his reported symptoms and the alarming vital signs she herself had just taken, concluding that Mr. Tanner was faking or responsible for his own illness. *Id*. These abnormal vital signs, including a dangerously high temperature of 105.8, high pulse, fast respirations, and very low pulse oxygenation, were conveyed to NP Mannon, who did not send him to the hospital despite the serious risks posed to Plaintiff. Instead, she ordered IV fluids and tylenol, which she knew could never treat, much less cure the cause of this progressing medical emergency. ¶ 44-46. While Defendant Shkolnik administered the IV fluids and drew blood, Mr. Tanner became lethargic to the point that she had to use a sternal rub to arouse him -- a pain technique used to assess the consciousness level of a patient who is not responding to verbal stimuli, or who cannot otherwise be aroused. ¶¶ 51-52. The need for use of a sternal rub *itself* requires hospitalization, however, despite having had to administer one and obtaining these vital signs indicative of obvious risk of serious harm, Ms. Shkolnik left Mr. Tanner in his cell and did not return until at about 11:00 am. *Id*. When she finally returned, she removed his supplemental oxygen for four minutes, and charted drops in oxygen saturation to a critically low 87-88%, demonstrating that his condition was not improving. ¶ 54-55. Yet, she did nothing more.

Mr. Tanner's abnormal vital signs and condition were also apparently conveyed to Defendant Dr. Maul, who ordered that he and Mr. Sferrazza get COVID tests and be placed together in isolation ¶¶ 56-57. Despite knowing that DRDC did not have the capacity to diagnose/treat COVID and without any assessment or treatment, Dr. Maul did not order hospitalization, the only place where diagnosis and treatment could occur. *Id*.

Throughout the rest of March 15, Mr. Tanner continued to decline. It was obvious to Mr. Sferrazza, a lay person, that he was in severe and worsening medical distress. ¶¶ 58-59. Mr. Sferrazza called for help over ten times during this period, pushing the emergency button in his cell and declaring a medical emergency, both of which, pursuant to CDOC protocol, are supposed to cause a quick reaction from medical staff. ¶¶ 61-62. Instead, medical staff only responded about three times, and both medical and correctional staff accused Mr. Sferrazza and Mr. Tanner of exaggerating, despite his known critical vital signs and outstanding lab tests. ¶¶ 62-63. Staff callously told them to stop pushing the button, the only way they could even request help for Mr. Tanner's undiagnosed and progressing medical emergency. *Id*.

For the rest of the day and overnight into March 16, Mr. Tanner -- slipping in and out of consciousness and with no improvement in his condition -- was again ignored and left without any medical attention. ¶¶ 64-66. At about 10:30 a.m. on March 16, or 31 hours after Mr. Tanner had first lost consciousness because of the severity of his fever and vomiting, and 25 hours after recording a 105.8 degree fever which had not broken, Defendant Nurse Supervisor Molina charted that he was "sitting hunged [sic] over in a chair", and that he became diaphoretic (sweating profusely and uncontrollably) about 45 minutes after she arrived. ¶ 68. Mr. Tanner told her that for two days he had a productive cough, difficulty breathing, body aches, loss of appetite, and pain to his right mid-to-posterior ribcage, all of which was confirmed in the available medical chart. ¶¶ 68-69.

Ms. Molina reported to Defendant NP Campbell that Tanner was not doing well, was feeling poorly, and that he was having difficulty breathing with diminished lung

sounds, all of which was confirmed in the available medical chart. Despite knowing that Mr. Tanner clearly needed higher level evaluation and care than CDOC could provide, NP Campbell chose not to evaluate Mr. Tanner because of COVID concerns for himself. ¶ 71. He did so in concert with Defendants Molina and HSA Cullyford, who together decided to defer provider assessment and "follow up in two hours," putting Mr. Tanner at needless risk, as both diagnosis and treatment were only available if he were simply transported to an appropriate facility. ¶ 74-75. NP Campbell clearly understood the risk of serious harm posed by Mr. Tanner's low oxygenation levels, charting "make sure patient has oxygen on," but no one did. Indeed, when Ms. Molina returned at 12:40 p.m., his "oxygen was not in place" and his saturation levels were critically low at 86%. His blood pressure had also dropped precipitously to a very low 96/64, his pulse was elevated, and he was having difficulty breathing with elevated respirations and diminished lung sounds on the left and absent on the right. ¶¶ 77- 79. Ms. Molina again conveyed these alarming symptoms and vital signs to NP Campbell, who again decided to keep Mr. Tanner onsite and provide minimal intervention, including a nebulizer and oxygen, which was clearly not improving his condition. By 2:20 p.m., even after nebulizer treatment, Mr. Tanner's oxygen levels "continue[d] to linger between 77% and 82%." Even with a non-rebreather mask his "oxygen saturation [would] not go above 85%." ¶¶ 81, 85-87.

At 2:42 p.m., nearly 36 hours after Mr. Sferrazza had first called out for emergency medical attention, Defendants finally sent Mr. Tanner to the hospital. ¶ 88. By the time he arrived at UCHealth, Mr. Tanner was in respiratory failure and septic shock, due to strep and MRSA pneumonia. He was gravely hypotensive, with elevated pulse and

respirations, and oxygen saturation levels dangerously low at 80%. ¶ 94. Upon arrival, UCHealth doctors immediately administered life saving measures, including IV fluids, IV antibiotics, and pressor medications. Mr. Tanner endured a number of painful and life-threatening complications because of the infection and measures taken to save his life, including limb ischemia and necrosis of his upper and lower extremities. His hands and feet turned black and had to be partially amputated. ¶¶ 95-97, 100-111.

Contrary to Defendants' rote assertion that Plaintiff's allegations are insufficient, Plaintiff expressly alleged that these constellation of alarming symptoms and vital signs were clear signs of a life-threatening medical emergency, alleging *inter alia*:

- "A temperature of 100.4 or higher is considered a fever. All reasonable health care workers know that adults with a temperature over 103 F should be monitored, and that if a fever reaches 105 or is accompanied by severe headache or vomiting, immediate medical attention outside the prison's capabilities is required." ¶ 38; "All reasonably trained health care workers are aware that a fever of 105.8 is extremely high in an adult man and, especially in combination with vomiting, severe headache, and other abnormal vital signs, likely indicates a significant bacterial infection that requires higher level evaluation and treatment tha[t] can't be provided in the prison." ¶ 39.

- "All reasonably trained health care workers are aware that it is an emergent symptom for Mr. Tanner not to be able to maintain oxygenation saturation in his blood." ¶41; "Any reasonably trained caregiver knows that an otherwise healthy person who cannot maintain oxygen saturations is in a critical medical condition. That Mr. Tanner couldn't not maintain adequate oxygenation *even with* supplemental oxygen underscored that he was in a medical crisis." ¶42.

- Any reasonably trained caregiver knows that a man with these vital signs who passes out multiple times and has to be revived with a pain technique is in a medical crisis and needs to be transferred to the hospital immediately. ¶ 53.

- "CDOC lacks the capacity to treat Mr. Tanner's medical emergency regardless of the cause, and especially here, given that medical defendants expressly acknowledge their inability to even have a provider assess Mr. Tanner due to their COVID concerns." ¶¶ 73, 81-82;

- "Between March 14, 2020. . .and when he was finally sent to the hospital around 2:42 pm March 16, 2020, Mr. Tanner's condition required prompt assessment and treatment at a hospital. However, throughout this time, Defendants did not provide such timely or proper assessment and treatment. They simply ignored him or attempted at times to manage rather than evaluate his symptoms, as he got worse and worse…Likewise, Mr. Tanner's initial complaints of feeling ill were disregarded and falsely attributed to drug use for which he showed no signs." ¶¶ 112-13.

## IV.  PLAINTIFF HAS MORE THAN MET HIS BURDEN TO OVERCOME THE QUALIFIED IMMUNITY DEFENSE AT THIS STAGE

Qualified immunity shields government officials performing discretionary functions from liability for damages "'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Boles v. Neet*, 486 F.3d 1177, 1180 (10th Cir. 2007) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Resolving the question of immunity involves a two-pronged test: (1) a court must decide whether the facts make out a violation of a constitutional right and (2) a court must decide whether the right at issue was "clearly established" at the time of the defendant's alleged misconduct. See *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). The Supreme Court holds that because prisoners "must rely on prison authorities to treat [their] medical needs . . . deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976). A claim for deliberate indifference has both an objective and a subjective component. *Self v. Crum*, 439 F.3d 1227, 1230 (10th Cir. 2006).

The objective component, that the deprivation at issue was sufficiently serious, is met if "it is one that has been diagnosed by a physician as mandating treatment or one

that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005). While counsel for Plaintiff correctly stated at the hearing regarding the discovery stay that Mr. Tanner's symptoms and condition at the time defendants saw him was indeed objectively serious, "[t]he question is not limited to whether the inmate's symptoms render a medical need sufficiently serious, but also clearly extends to whether the potential **harm** to the inmate is sufficiently serious." *Mallory v. Jones* , No. 10-cv-02564-CMA-KMT, 2011 U.S. Dist. LEXIS 48378, at *12-16 (D. Colo. May 3, 2011) (emphasis supplied) quoting *Mata*, 427 F.3d at 752. The Tenth Circuit has made clear that where the "alleged harm" is "sufficiently serious", "the symptoms displayed are relevant only to the subjective component of the test: were the symptoms such that a prison employee knew the risk to the prisoner and chose (recklessly) to disregard it?" *Id.* at 753.

Under the subjective component, the defendant must have a "sufficiently culpable state of mind." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (citation omitted). The subjective component is satisfied by allegations that the official "knows of and disregards an excessive risk to [a detainee's] health or safety." *Olsen v. Layton Hills Mall,* 312 F.3d 1304, 1315-16 (10th Cir. 2002). In other words, the plaintiff must establish that the defendants "knew he faced a substantial risk of harm and disregarded that risk, by failing to take reasonable measures to abate it." *Hunt v. Uphoff*, 199 F.3d 1220, 1224 (10th Cir. 1999). "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from

circumstantial evidence . . . and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842.

The subjective component "does not require a finding of express intent to harm, nor must a plaintiff show that a prison official acted or failed to act believing that harm actually would befall an inmate." *Mitchell v. Maynard*, 80 F.3d 1433, 1442 (10th Cir. 1996). Rather, "the plaintiff must show that 'the official acted or failed to act despite his knowledge of a substantial risk of serious harm.'" *Mata*, 427 F.3d at 752. Where providers act as a gatekeeper to the needed level of acuity, they will be liable for deliberate indifference when "the medical professional knows that his role in a particular medical emergency is solely to serve as a gatekeeper for other medical personnel capable of treating the condition, and if he delays or refuses to fulfill that gatekeeper role due to deliberate indifference." *Sealock v. Colorado*, 218 F.3d 1205, 1211 (10th Cir. 2000).

A.  Plaintiff has Plausibly Alleged Deliberate Indifference by Individual Defendants.

First, given the life-threatening infection and ultimate loss of limbs, Plaintiff unquestionably had a serious medical need that satisfies the objective component of the test, and Defendants do not contend otherwise.

Second, with respect to the subjective component, Plaintiff plausibly alleged that all of these Defendants were required to immediately escalate him to a higher level of care. They thus all failed in their gatekeeper role because they were consciously aware that Mr. Tanner "was exhibiting severe, obvious, recognizable symptoms…which [Defendants] must have known required urgent medical attention and indicated a need for…diagnostic testing to assess the reason for these symptoms," yet they did not obtain

such care. *Kellum v. Mares*, 657 F. App'x 763, 770 (10th Cir. 2016) (claim stated where Plaintiff "was exhibiting severe, obvious, recognizable symptoms," including "breathing problems, nausea, low blood pressure, poor skin color, and inability to stand or walk" which the Nurse would know required "emergency medical treatment."); *Mallory*, 2011 U.S. Dist. LEXIS 48378 at *7 (Judge Arguello found deliberate indifference alleged where inmate had 86% oxygen level, which indicated organs were not receiving enough oxygen, plaintiff looked very pale, could not detect blood pressure and defendants "did not immediately call an ambulance."). While Defendants' Motion selectively picks which facts to highlight based on whether a specific name was included in each paragraph, it is entirely "proper for [a] Plaintiff to [make] a single allegation as applicable to all [the] Defendants" when the basis of the claim against each is similar. *Mauchlin v. Davis,* No. 12-cv-01449-RM-BNB, 2014 U.S. Dist. LEXIS 143873, at *18-20 (D. Colo. Oct. 9, 2014).

Additionally, Plaintiff has specifically alleged that: 1) NP Mannon knew of and disregarded an excessive risk to Mr. Tanner's health and safety when, knowing on March 15 that he had been vomiting, lost consciousness, had a medical emergency called multiple times by his cellmate, heard him say he was "going to die", had a temperature of 105.8 degrees, and dangerously low 87-88% oxygen levels, she did not initiate hospital emergency transport; 2) Ms. Shkolnik knew of and disregarded an excessive risk to Mr. Tanner's health and safety on March 15 when, knowing of the same above described symptoms and vitals, did not collect the labs STAT and did not initiate emergency medical

treatment. Instead, she accused Mr. Tanner of having taken illegal drugs;[4] 3) Nurse Supervisor Molina knew of and disregarded an excessive risk to Mr. Tanner's health and safety on March 16th when, knowing that he had a 105.8 degree fever, low oxygen rates, was in and out of consciousness, had diminished lung sounds, had been vomiting, was "sitting hunged [sic] over in a chair", was sweating profusely, and in pain, did not initiate emergency medical treatment; and 4) NP Campbell and HSA Cullyford knew of and disregarded an excessive risk to Mr. Tanner's health and safety on March 16th when, having been told of the same above-described abnormal and serious symptoms and vitals, decided to defer provider assessment and to not initiate emergency treatment.

Plaintiff has also plausibly alleged that Dr. Maul knew of and disregarded an excessive risk to Mr. Tanner's health and safety when, having been told on March 15 about these alarming vital signs and deteriorating condition, only ordered a COVID test. Even if COVID tests were coming back quickly in March 2020, which they were absolutely not as there was no rapid test even available, a test does not treat organ failure and crashing conditions, which these reported symptoms indicated. Having chosen to defer assessment knowing treatment and diagnoses could only be rendered outside of DRDC, Defendant Maul acted with deliberate indifference by not sending Mr. Tanner immediately to the hospital where both diagnosis and treatment could occur. Further, Dr. Maul is the person responsible for setting up nursing protocols in the prison, yet did not have such

---

[4] *See Jones v. Muskegon County*, 625 F.3d 935, 944 (6th Cir. 2010) (failure of nurses to respond to prisoner who wrote that he had abdominal pain and suspected he had cancer, because they had concluded he was "faking it," supported a deliberate indifference claim).

protocols for fever and abnormal vital signs, which was a contributing cause of Mr. Tanner not being sent to the hospital sooner.

Finally, Plaintiff has also plausibly alleged that this delay caused substantial harm, a question of fact that will be supported by extensive experts. *Vigil v. Raemish*, No. 18-cv-01499-WJM-NRN, 2019 U.S. Dist. LEXIS 54245, at *21 (D. Colo. Mar. 29, 2019) (denying dismissal and qualified immunity, noting that whether the outcome would have happened had PA not failed in gatekeeper and direct care role and "not delayed and/or denied him treatment is a question of fact that cannot be decided at this early stage.").

1. *Defendants Mental State and Knowledge of Risk is a Question of Fact.*

Defendants all contend that they had no idea how serious Mr. Tanner's condition was, conclusory stating that "the CDOC medical staff provided care and monitored plaintiff's symptoms with great caution," Defendants' Motion, p. 2. Yet "whether a prison official had the requisite knowledge of a substantial risk is a question of fact," and thus not appropriately resolved by accepting Defendants self-serving statements on a motion to dismiss. *Self*, 439 F.3d at 1231. When, evidence shows that medical staff were informed about a serious condition and risk to an inmate's health, such allegations create genuine issues of material fact, making even summary judgment, let alone dismissal on the pleadings, inappropriate. *Olsen*, 312 F.3d at 1317; *Sealock*, 218 F.3d at 1211-12 (summary judgment should not have been entered on a deliberate indifference claim in favor of a PA, who did not call an ambulance in response to inmate's chest pain).

Here, Mr. Tanner was increasingly sick and needed immediate hospitalization, not isolation, over the counter pain meds, and fluids, none of which stabilized, let alone

improved, his medical emergency. People who are this sick and become septic appear very ill - - thus it was obvious to Mr. Tanner's cellmate, a lay person, that Mr. Tanner needed immediate help. While Defendants are of course free to litigate their version of the case, Plaintiff is entitled to the inference plausibly flowing from the well-pled evidence that these trained staff disregarded serious symptoms obvious to lay people.[5] "[I]f a risk is obvious, so that a reasonable man would realize it, we might well infer that [the prison official] did in fact realize it." *Tafoya v. Salazar*, 516 F.3d 912, 917 (10th Cir. 2008).

2. *Plaintiff's Allegations and Inferences Allege Far More Than Negligence.*

Defendants maintain that these facts and inferences only amount to a disagreement over "the appropriate course of action", concluding that this is nothing more than malpractice. Defendants' Motion, p. 15. But in order to have the benefit of the mere mistreatment or "negligent failure to provide adequate medical care" defense, the medical professional must "provide[] a level of care consistent with the symptoms presented by the inmate." *Baltierra v. Adams Cty.,* No. 18-cv-00664-CMA-MEH, 2019 U.S. Dist. LEXIS

---

[5] Courts consistently hold that whether the person actually believed what they claim to have believed is for the trier of fact, who is not required to credit their claims. *See Estate of Stieb v. Johnson*, No. 16-cv-02548-KLM, 2018 U.S. Dist. LEXIS 147186, *37 (D. Colo. Aug. 29, 2018)(denying summary judgment where under plaintiffs theory, defendants were "deliberately indifferent" and under defendants, they were "at most, negligent."); *Vaughn v. Gray*, 557 F.3d 904, 909 (8th Cir. 2009) (failure to respond to prisoner who vomited all night could support finding of deliberate indifference despite defendants' claim that they thought the prisoner was vomiting because he had ingested shampoo; "Appellants' self-serving contention that they did not have the requisite knowledge does not provide an automatic bar to liability in light of the objective evidence to the contrary."); *Hudak v. Miller*, 28 F.Supp.2d 827, 832 (S.D.N.Y. 1998) (doctor's self-serving statement that he believed headaches were caused by tension cannot defeat liability if the facts showed that the risk of a serious problem was so obvious).

48616, at *9 (D. Colo. Mar. 25, 2019) quoting *Self*, 439 F.3d at 1233. The fact that plaintiff has seen numerous providers does "not necessarily mean that he received treatment for serious medical needs." *Hunt*, 199 F.3d at 1223-24 (rejecting defendants' arguments that denial of insulin to treat diabetes and failure to perform certain medically recommended procedures reflected only "a disagreement with his medical treatment.") The fact that differences in medical judgment are not always sufficient to establish an Eighth Amendment violation, does not "foreclose the possibility that medical or mental health treatment will be so inadequate that it will rise to the level of an Eighth Amendment violation." *Anderson v. Colorado, Dep't of Corr.,* 848 F. Supp. 2d 1291, 1299 (D. Colo. 2012) (denying summary judgment).  As the Second Circuit has stated:

> while "mere medical malpractice" is not tantamount to deliberate indifference, certain instances of medical malpractice may rise to the level of deliberate indifference; namely, when the malpractice involves culpable recklessness, i.e., an act or a failure to act by the prison doctor that evinces "a conscious disregard of a substantial risk of serious harm." Accordingly, not every instance of medical malpractice is, *a priori,* precluded from constituting deliberate indifference.[6]

Here, Plaintiff does not simply disagree with the course of care. There is a reason 45-year-old men don't usually lose their limbs from pneumonia infections in the United States. Isolating someone who is rapidly declining despite giving them fluids and oxygen does not reflect "treatment consistent with the symptoms present." *Self*, 439 F.3d at 1231. Rather, the fact that a normally healthy adult's body is failing to maintain oxygenation is

---

[6] *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996) (internal citations omitted). The Tenth Circuit has held that in cases in which some medical care or treatment is provided, an inmate nonetheless may have a claim if "the need for additional treatment or referral to a medical specialist [was] obvious." *Self* , 439 F.3d at 1232.

the emergency – the cause of which required immediate diagnosis – and all Defendants failed in this gatekeeper role. *See Vigil*, 2019 U.S. Dist. LEXIS 54245, at *22. Here, the ineffective 'care' "was so cursory as to amount to no treatment at all." *Ancata v. Prison Health Servs., Inc.,* 769 F.2d 700, 704 (11th Cir. 1985). As Plaintiff's allegations "indicate this type of indifference, dismissal prior to discovery is premature." *Id.*

Defendants' COVID deflections are a red herring, as they did not diagnose or treat Mr. Tanner for COVID, and in fact, no such treatment or rapid testing existed in March 2020 and certainly was not available at DRDC.[7] Rather, they refused to evaluate him out of fear of catching COVID, which only highlights the obvious danger Mr. Tanner was in and need to hospitalize for actual treatment. Contrary to the insinuation that staff would need to know that he had pneumonia to be liable, "the relevant question is the *risk* of substantial harm, not whether the official knew of the specific medical condition causing the symptoms presented by the prisoner." *Kellum*, 657 F. App'x at 770. *See also Tafoya,* 516 F.3d at 916 ("knowledge of [substantial] risk need not be . . . knowledge of the particular manner in which injury might occur.").

---

[7] Bizarrely, Defendants assert they isolated Mr. Tanner pursuant to a COVID protocol. Isolation is not treatment. Whatever protocol they claim to be following, it was **not** one for treatment as no such protocol existed. Undersigned counsel were told in response to a CORA request that there were no such protocols. Furthermore, as lead cooperating counsel for the ACLU in a DOC class action relating to COVID prison conditions, counsel knows that treatment protocols were developed as part of the consent decree in that case after these events. Notably, as their counsel put it, COVID had not yet "breached the walls" of DOC. Defendants' Motion, p. 2. But even if it had breached those walls by then, their constitutional duties remained in full force; the Constitution is not suspended in times of crisis, whether wartime or pandemic, and COVID does not grant Defendants a "blank check" to ignore their constitutional duties. *Hamdi v. Rumsfeld*, 542 U.S. 507, 536 (2004).

Whatever Mr. Tanner had that was causing him to deteriorate, whether COVID, pneumonia, or some other illness, given the prison's capabilities, the **only** level of care consistent with a 105.8 fever, pulse ox of 87%, vomiting, loss of consciousness, and other abnormal symptoms was immediate hospitalization. Defendants cannot evade liability simply because they checked on Plaintiff a few times, told him to drink less coffee, and gave him ibuprofen and an oxygen mask as his organs were dying from infection, as such a response was patently reckless "in the face of the obvious severity of Plaintiff's condition." *Mallory,* 2011 U.S. Dist. LEXIS 48378 at *20-22; *W. v. Keve*, 571 F.2d 158, 162 (3d Cir. 1978) ("Although the plaintiff has been provided with aspirin, this may not constitute adequate medical care. If 'deliberate indifference caused an easier and less efficacious treatment' to be provided, the defendants have violated the plaintiff's Eighth Amendment right."). Nor can Defendants obtain dismissal because they belatedly obtained medical treatment. As Judge Arguello found: "That Plaintiff received medical treatment before or after these Defendants were notified of Plaintiff's condition has no bearing on whether they were deliberately indifferent to Plaintiff's condition <u>at the time</u> they refused to assist Plaintiff." *Mallory*, 2011 U.S. Dist. LEXIS 48378 at *19-20.

Given this constellation of symptoms, Defendants repeated choices to delay care for over 36 hours reflected a conscious disregard of this substantial risk of harm. Defendants' self-serving statements to the contrary do not undo plausible allegations.[8]

---

[8] *See* Order by Magistrate Judge Mix at *14, *Estate of Lillis v. Correct Care Solutions, et al*, No. 16-cv-03038 (D. Colo. Mar. 30, 2018), ECF No. 87 (deliberate indifference alleged against jail nurse because "at this state of the litigation the Court is tasked with assessing the sufficiency of the Complaint, not the parties' medical opinions.")

B.  The Complaint Plausibly Alleges a Clearly Established Constitutional Violation.

Deliberate indifference in response to a serious medical need, including delay of care, is a violation of a clearly established constitutional right under the Eighth Amendment. *Estelle,* 429 U.S. at 104. "A prisoner may satisfy the subjective component by showing that defendants' delay in providing medical treatment caused either unnecessary pain or a worsening of her condition. Even a brief delay may be unconstitutional." *Mallory*, 2011 U.S. Dist. LEXIS 48378, at *12-16 quoting *Mata*, 427 F.3d at 755; *Sealock,* 218 F.3d at 1210 (delay of "several" hours in taking inmate with chest pains to a hospital amounted to refusal to fulfill the gatekeeper role.). It was also clearly established to be unconstitutional when "a medical professional completely denies care although presented with recognizable symptoms which potentially create a medical emergency ... and the prison official, knowing that medical protocol requires referral or minimal diagnostic testing to confirm the symptoms, sends the inmate back to his cell." *Kellum*, 657 F. App'x at 767–68 quoting *Al–Turki*, 762 F.3d at 1194; *Mallory*, 2011 U.S. Dist. LEXIS 48378 at *37.

Based on his symptoms and complaints, it was obvious that Mr. Tanner faced a substantial risk of serious harm or death that required hospitalization. *Owens v. United States*, No. 1:20-cv-01094-RBJ-NRN, 2021 U.S. Dist. LEXIS 143584, at *10 (D. Colo. Aug. 2, 2021) (clearly established that disregarding an obvious serious medical condition is unconstitutional). Delaying emergency care for Mr. Tanner's ongoing worsening condition accompanied by "vital signs indicating a need for urgent medical attention" unquestionably was unconstitutional. *Kellum*, 657 F. App'x at 764; *Mata*, 427 F.3d at 751.

20

WHEREFORE, Plaintiff requests that the Court deny Defendants' motion.

Respectfully submitted this 17th day of December, 2021.

| | |
|---|---|
| */s/ Erica T. Grossman* | */s/ Matthew R. Laird* |
| Erica Grossman | Matthew R. Laird |
| Anna Holland Edwards | Isobel S. Thomas |
| Dan Weiss | THOMAS KEEL & LAIRD, LLC |
| HOLLAND, HOLLAND EDWARDS & GROSSMAN, LLC | 50 S. Steele Street, Suite 450 |
| 1437 High Street | Denver, CO 80209 |
| Denver, CO  80218 | 303-372-6130 |
| 303-860-1331 | mlaird@thomaskeel.com |
| erica@hheglaw.com | *Attorneys for Plaintiff* |
| *Attorneys for Plaintiff* | |

## CERTIFICATE OF SERVICE

I hereby certify that on the 17th day of December, 2021, the foregoing was filed using the CM/ECF system. I hereby certify I will send electronic notification of said filing to the following recipients.

| | |
|---|---|
| Kathryn A. Starnella | Matthew R. Laird |
| WELLS, ANDERSON & RACE, LLC | Isobel S. Thomas |
| kstarnella@warllc.com | THOMAS KEEL & LAIRD, LLC |
| *Attorney for Defendants* | mlaird@thomaskeel.com |
| | ithomas@thomaskeel.com |
| | *Attorneys for Plaintiff* |

*/s/ Brooke Thiele-LaForest*
Brooke Thiele-LaForest, Paralegal