IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 21-cv-02340-CMA-NRN

CHRISTOPHER TANNER,

Plaintiff,

v.

ZACHARY A CAMPBELL, NP, individually;
JILL M. MANNON, individually;
ALLA SHKOLNIK, individually;
DORA MOLINA, RN, individually;
RANDOLPH MAUL, MD, individually;
TINA CULLYFORD, HSA, individually;

Defendants.

---

**REPORT AND RECOMMENDATION ON DEFENDANTS' MOTION TO DISMISS
PURSUANT TO FED. R. CIV. P. 12(b)(6) (Dkt. #19)
AND
ORDER LIFTING STAY OF DISCOVERY**

---

**N. REID NEUREITER**
**United States Magistrate Judge**

This matter comes before the Court on Defendants' Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6) (the "Motion") (Dkt. #19), filed November 15, 2021. The Motion was referred to me by Judge Arguello for recommendation on November 17, 2021. (Dkt. #20.) Plaintiff responded to the Motion on December 17, 2021. (Dkt. #37.) Defendants filed their reply in support of the Motion on January 7, 2022. (Dkt. #38.) I heard argument on the Motion on January 11, 2022. (*See* Dkt. #39.)

This is a civil rights case brought under 42 U.S.C. § 1983. Plaintiff Christopher Tanner ("Mr. Tanner" or "Plaintiff") alleges deliberate indifference by Colorado

Department of Corrections ("CDOC") medical personnel to his serious medical needs while he was housed at the Denver Reception and Diagnostic Center ("DRDC"), which is a CDOC facility. Mr. Tanner alleges that he was suffering for many hours with an extremely high fever, respiratory distress, and low oxygen levels, which obviously merited immediate emergency medical care. Instead, the DRDC personnel effectively ignored his complaints and his declining health status to the point that, when Tanner was finally sent to the hospital, he was near death with septic bacterial pneumonia. While he ultimately survived the ordeal, he had to have most of his fingers and toes and portions of his hands and feet amputated. (Dkt. #1 at ¶ 1). Defendants move to dismiss the suit for failure to plausibly allege a constitutional violation with respect to each individual Defendant. Defendants also assert that they should be entitled to qualified immunity justifying dismissal of the suit.

The Court hereby **RECOMMENDS** that Defendants' Motion be **DENIED** and **ORDERS** that the previously entered stay of discovery be **LIFTED**. (*See* Dkt. #39, staying discovery until issuance of Recommendation.)

## **BACKGROUND**

### **Plaintiff's Allegations of Civil Rights Violations**

The following summarizes Mr. Tanner's Complaint.[1]  Under the motion to dismiss standard, all the non-conclusory allegations are deemed to be true and are to be read in

---

[1] The Court notes that the Complaint named Eleana Flores as a Defendant in this matter and Defendants moved for her dismissal. However, on December 14, 2021, Ms. Flores was dismissed from this matter by stipulation of the parties. (*See* Dkt. ## 34, 35.) Therefore, the Recommendation does not discuss Ms. Flores.

the light most favorable to Mr. Tanner. *Hall v. Bellmon*, 935 F.2d 1106, 1109 (10th Cir. 1991).

In January 2020, Mr. Tanner was 45 years old. He entered the CDOC system and was housed at the DRDC. (Dkt. #1 at ¶ 13.) The DRDC is generally used as a transitional facility to assess and classify prisoners as they come into the prison system. But the DRDC also has some permanently assigned prisoners who have special medical needs. (*Id.* at ¶ 14.) At the time, Mr. Tanner was undergoing treatment for opiate use disorder and was placed on Suboxone after being weaned off methadone. (*Id.* at ¶ 16.) Given Mr. Tanner's short sentence (he was eligible for parole in the spring of 2020), and the need for monitoring while on Suboxone, he was housed at the DRDC rather than being sent to a CDOC correctional facility. (*Id.* at ¶ 17.)

On the morning of March 14, 2020, Mr. Tanner woke up with a "splitting headache," a bad cough, and body aches. These symptoms lasted through the day. (*Id.* at ¶ 20.) That evening, he left a message for his wife, telling her he felt like he had the flu, had a terrible headache, and felt very sick. (*Id.* at ¶ 21.) At 3:00 a.m. on the morning of March 15, 2020, Mr. Tanner woke up feeling extremely hot. He laid on the concrete floor of his cell to cool off and began vomiting. (*Id.* at ¶ 22.) He then lost consciousness. (*Id.* at ¶ 23.)

Mr. Tanner was clearly seriously ill—to the point where Mr. Tanner's cellmate called for first responders, repeatedly pushed the call button in the cell, banged on the glass, and yelled out that Mr. Tanner needed to go the hospital and that he was dying. (Id. at ¶¶ 24–25.)

Sometime between approximately 3:00 and 6:00 a.m. on March 15, 2020, a medical worker apparently assessed Mr. Tanner, although this interaction is not recorded in Mr. Tanner's medical record. Mr. Tanner's alarming condition was also conveyed to Defendant Nurse Practitioner ("NP") Jill Mannon Keegan ("NP Mannon"), who at 6:00 a.m. ordered several diagnostic lab tests, including a urinalysis, a CBC, and a complete metabolic panel. But NP Mannon made no notes about Mr. Tanner's condition at the time and did not record any vital signs. (*Id*. at ¶¶ 26–28.)

NP Mannon ordered these tests "STAT"—meaning that the order was to be carried out immediately. Mr. Tanner alleges that labs are ordered "STAT" when a provider knows that delay in receiving the ordered information poses an unreasonable risk of harm to the patient. Despite this order, however, the labs were not sent "STAT." (*Id*. at ¶¶ 29–30.) Mr. Tanner was not moved to the medical unit or otherwise observed for the next several hours. (*Id*. at ¶ 31.)

Despite the order of labs "STAT," Defendant Alla Shkolnik, a licensed practical nurse ("LPN"), did not arrive to collect specimens until 8:30 a.m.—nearly three hours later. When Ms. Shkolnik arrived at Mr. Tanner's cell to collect the ordered blood and urine samples, she found him red and sweating and on the floor of his cell. Mr. Tanner told Ms. Shkolnik he was sick and felt like he was "going to die," that he had a severe headache all day the day before, that he woke up at 3:00 a.m. because he was so hot and started throwing up, and that his cellmate had called first responders because he had lost consciousness. (*Id*. at ¶¶ 32–35.)

When she saw him at 8:30 a.m., Ms. Shkolnik found Mr. Tanner to have "an elevated pulse, elevated respirations, very low oxygen saturations between 87 and

88%, and an extremely high temperature of 105.8." (*Id*. at ¶ 37.) Instead of taking immediate life-saving steps at that time, Ms. Shkolnik is alleged to have "repeatedly accused Mr. Tanner of having taken illegal drugs, disregarding his reported symptoms and instead baselessly concluding Mr. Tanner was faking or responsible for his own illness." (*Id*. at ¶ 36.)

Mr. Tanner alleges that "[a]ll reasonable health care workers know that adults with a temperature over 103 F should be monitored, and that if a fever reaches 105 or is accompanied by severe headache or vomiting, immediate medical attention outside the prison's capabilities is required." (*Id*. at ¶ 38.) He further alleges that all reasonably trained health care workers are aware that a fever of 105.8 is extremely high in an adult man and, especially in combination with vomiting, severe headache, and other abnormal vital signs, likely indicates a significant bacterial infection that requires a higher-level evaluation and treatment than can be provided in a prison environment. (*Id*. at ¶ 39.) Ms. Shkolnik noted that Mr. Tanner's oxygen saturation levels were dangerously low at 87–88% on room air, and she put Mr. Tanner on "1L of O2 via a nasal canula." (*Id*. at ¶ 40.) However, Mr. Tanner claims that all reasonably trained health care workers are aware that it is an emergent symptom for a person not to be able to maintain oxygenation saturation in his blood, and, similarly, that any reasonably trained caregiver knows that an otherwise healthy person who cannot maintain oxygen saturation levels is in a critical medical condition. (*Id*. at ¶¶ 41–42.) Mr. Tanner could not maintain adequate oxygenation even with supplemental oxygen, which underscored that he was in a medical crisis. (*Id*. at ¶ 42.)

Ms. Shkolnik conveyed the abnormal vital signs to NP Mannon, who ordered intravenous fluids ("IV") for Mr. Tanner along with two tablets of 500mg of acetaminophen by mouth three times daily. But Mr. Tanner alleges that NP Mannon knew that over-the-counter pain medicine could never treat, let alone cure, the underlying condition for these symptoms. This is because, as Mr. Tanner alleges, any reasonably trained care giver knows that IV fluids will not treat the cause of an infection or sepsis. (*Id*. at ¶¶ 44–46.)

Ms. Shkolnik administered Mr. Tanner's blood draw and IV at approximately 9:00 a.m. in his cell. While being given fluids, Mr. Tanner was very nauseated and started to "dry heave" after the IV started. He had a significant change in mental status and became so lethargic that Ms. Shkolnik had to use a sternal rub to arouse him. Mr. Tanner explains that a sternal rub is a pain technique employed to assess the consciousness level of a patient who is not responding to verbal stimuli or to arouse a person who cannot otherwise be aroused. (*Id*. at ¶¶ 50–52.) As alleged in the Complaint, any reasonably trained caregiver knows that a man exhibiting Mr. Tanner's vital signs, who passes out multiple times and who must be revived with a pain technique, is in a medical crisis and needs to be transferred to the hospital immediately. But instead, after using the sternal rub, Ms. Shkolnik just left Mr. Tanner in his cell for hours. (*Id*. at ¶¶53–54.)

Ms. Shkolnik returned at approximately 11:00 a.m. on March 15, removed Mr. Tanner's supplemental oxygen for four minutes, and charted that his saturation quickly dropped critically low, to 87–88%. (*Id*. at ¶ 55.) These abnormal vital signs and condition were conveyed to Dr. Randolph Maul, who ordered that Mr. Tanner and Mr. Sferrazza,

his cellmate, receive COVID tests, but did not make any orders to send Mr. Tanner to the hospital. (*Id*. at ¶ 56.)

Mr. Tanner and Mr. Sferrazza (who was not sick and did not become sick) were placed on isolation protocols together in their cell and tested for COVID—but nothing more was done to address Mr. Tanner's emergent situation. He continued to decline throughout the remainder of March 15, 2020. (*Id*. at ¶¶ 57-58.)

The obvious nature of Mr. Tanner's severe and worsening condition was apparent to Mr. Sferrazza, who was the only person observing Mr. Tanner's status and who became very concerned. Indeed, Mr. Sferrazza was so concerned that he had another inmate make a call on his behalf and read a letter he wrote. In this letter, Mr. Sferrazza stated that Mr. Tanner "woke up with a 105 fever, cold sweats, paleness of skin, throwing up, and headache." Throughout the day and into the night, Mr. Sferrazza called for help over ten times, by pushing the emergency button in his cell and by declaring a medical emergency, which, pursuant to CDOC protocol, was supposed to cause a quick reaction from medical staff. Despite pushing the button or requesting emergency help over ten times, medical staff only responded about three times. And, rather than actually responding to or addressing the emergency, medical and correctional staff accused Mr. Sferrazza and Mr. Tanner of lying and told them to stop pushing the button. Mr. Tanner was left without any medical attention the rest of the day on March 15, 2020 and overnight. (*Id*. at ¶¶ 60–64.) During this period, Mr. Tanner was in and out of consciousness and repeatedly asked his cellmate if he was going to die. Mr. Sferrazza had to help carry Mr. Tanner to get him off the floor. (*Id*. at ¶¶ 65–66.)

At 10:30 a.m. the next morning, March 16, 2020, Defendant Nurse Supervisor Dora Molina assessed Mr. Tanner. Mr. Tanner was sitting hung over in a chair. He became diaphoretic (meaning perspiring heavily) 45 minutes after Ms. Molina arrived. Ms. Molina reported to Defendant NP Zachary Campbell that Mr. Tanner was not doing well, was feeling poorly, and had diminished lung sounds. (*Id*. at ¶¶ 67–70.)

The Complaint alleges that although NP Campbell knew that Mr. Tanner clearly needed higher-level evaluation and care than CDOC could provide, he chose not to evaluate Mr. Tanner due to concern for COVID-19 and exposure in staff and clinic. (*Id*. at ¶ 71.)

Mr. Tanner did not have COVID-19. But even if he did have COVID-19, he was nevertheless experiencing a medical emergency that could not be treated at the CDOC and required immediate hospitalization. (*Id*. at ¶¶ 72–73.) Despite Mr. Tanner's critical vital signs of which NP Campbell, Ms. Molina, and Defendant Health Services Administrator ("HSA") Tina Cullyford[2] all were aware, they jointly decided to keep Mr. Tanner on site, to defer provider assessment, and to follow up in two hours. (*Id*. at ¶ 74.)

Mr. Tanner alleges that low oxygen is known to cause a risk of serious bodily injury if not addressed. Knowing of this risk, NP Campbell specifically charted, "make sure patient has oxygen on." But, when Ms. Molina returned two hours later at 12:40 p.m., Mr. Tanner's oxygen was not in place and his saturation levels was at a critically low 86% on room air. (*Id*. at ¶¶ 76–78.) At that time, Ms. Molina also charted that Mr.

---

[2] Defendant explains that this is the correct spelling of Ms. Cullyford's name. (Dkt. #38 at 1, n. 1).

Tanner's blood pressure had dropped precipitously to 96/64 and his pulse and respirations were elevated. His lung sounds were diminished to the left and absent in the right. At around 12:40 p.m. on March 16, 2020, Ms. Molina again conveyed Mr. Tanner's alarming symptoms and vital signs to NP Campbell. (*Id*. at ¶¶ 79–80.)

The Complaint further explains that, although it was obvious that Mr. Tanner, who for more than a day had been in the throes of a medical emergency, required a higher level assessment and care than could be provided at the DRDC, NP Campbell again chose to keep Mr. Tanner on site and provide minimal intervention, ordering only that Mr. Tanner receive an albuterol nebulizer and oxygen. While NP Campbell knew it was necessary to take an x-ray of Mr. Tanner's lungs, NP Campbell discussed with HSA Cullyford the continued deferral of having Mr. Tanner come to the facility clinic for an x-ray because of COVID concerns. (*Id.* at ¶¶ 81–82.)

HSA Cullyford and NP Campbell arranged to have an x-ray taken in the multipurpose room using a portable x-ray machine. But, given the medical capabilities of the DRDC, Mr. Tanner was far past the point where diagnostic tests in prison (whatever they would show) were sufficient as he was unable to maintain enough oxygen for his body. He needed to be in the hospital. By about 2:20 pm, even after nebulizer treatment, Mr. Tanner's oxygen saturation levels "continue[d] to linger between 77% - 82%." Ms. Molina then started Mr. Tanner on a non-rebreather mask, a higher-level oxygen delivery device than the nasal canula, which she turned up to 15 liters of oxygen. Even with the rebreather mask, Mr. Tanner's oxygen saturation would not go above 85%. (*Id*. at ¶¶ 83–87.)

Finally, at 2:42 p.m., nearly 36 hours after Mr. Sferrazza had first called out for emergency medical attention, NP Campbell, Dr. Maul, and HSA Cullyford arranged for Mr. Tanner's emergent transport to the hospital. For a day and a half, CDOC's medical staff had not wanted to transport Mr. Tanner to the hospital. They only agreed to do so when it was too late, with Mr. Tanner being much sicker than he should have been had he been timely transported. (*Id.* at ¶¶ 88–89.)

The paramedics who arrived to take Mr. Tanner to the hospital noted that he was diaphoretic, pale, hypoxic, and tachycardic during transport, and his condition was emergent. By the time he arrived at the Emergency Department at UCHealth Anschutz, Mr. Tanner was in respiratory failure and experiencing severe septic shock. His oxygen saturation remained dangerously low at 80%. (*Id.* at ¶¶ 90–94.) Mr. Tanner was admitted to UCHealth with severe septic shock with respiratory failure due to strep and MRSA pneumonia. UCHealth doctors administered life saving measures, including IV fluids, IV antibiotics, and pressors. (*Id.* at ¶¶ 95–96.)

Mr. Tanner stayed at UCHealth from March 16 to April 8, 2020. He suffered stress cardiomyopathy, limb ischemia with extensive digital necrosis,[3] recurrent hospital acquired pneumonia, and acute renal failure. His pneumonia ultimately resolved after two courses of extensive spectrum antibiotic treatment. He required oxygen throughout

---

[3] "Necrosis" means the death of body tissue. *See* Necrosis, MedlinePlus Medical Encyclopedia, https://medlineplus.gov/ency/article/002266.htm (last visited February 3, 2022).

his admission. He required dialysis, among other treatments, for his renal failure. He experienced a Type II myocardial infarction[4] due to septic shock. (*Id*. at ¶ 97.)

Mr. Tanner's necrosis in his hands and feet was caused by the loss of blood flow to his extremities due to the amount of pressors required to keep him alive. When he regained consciousness after days in the hospital, his hands and feet had turned black. His doctors told him that he had to be prepped for various amputations. Ultimately, Mr. Tanner underwent amputations on all four of his extremities, including both his feet, amputation of his left hand at the wrist joint, and multiple finger amputations on his right hand. (*Id*. at ¶¶ 101–111.)

Mr. Tanner has spent months healing. However, because of on-going pain, he may have more surgeries to have his feet completely removed in the hope that he might be able to get better prosthetics and not be reliant on a wheelchair for mobility. (*Id*. at ¶ 118.)

### Plaintiff's Claim for Relief against the Defendants

Mr. Tanner brings a single claim for relief against all individual Defendants. He sues for violation of his constitutional rights under 42 U.S.C. § 1983, alleging that each of the Defendants violated his right to be free from deliberate indifference to and reckless disregard of known serious medical needs. (*Id*. at ¶ 122–25.) Mr. Tanner alleges that all the named Defendants knew of Mr. Tanner's deteriorating condition and serious medical needs but consciously decided to not report the symptoms or not to provide him with obviously necessary urgent medical care. (*Id*. at ¶ 127.) Defendants

---

[4] A "myocardial infarction" is another name for a heart attack. *See* Heart Attack, Johns Hopkins Medicine, https://www.hopkinsmedicine.org/health/conditions-and-diseases/heart-attack (last visited February 3, 2022).

are alleged to have consciously ignored both the pleas of Mr. Tanner and his cellmate, and the objective medical symptoms that mandated immediate hospitalization. (*Id*. at ¶ 128.)

## LEGAL STANDARDS

### Motion to Dismiss Under Rule 12(b)(6)

Rule 12(b)(6) provides that a defendant may move to dismiss a claim for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003) (citations and quotation marks omitted).

"A court reviewing the sufficiency of a complaint presumes all of plaintiff's factual allegations are true and construes them in the light most favorable to the plaintiff." *Hall*, 935 F.2d at 1109. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausibility, in the context of a motion to dismiss, means that the plaintiff pleaded facts which allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. The *Iqbal* evaluation requires two prongs of analysis. First, the Court identifies "the allegations in the complaint that are not entitled to the assumption of truth," that is, those allegations which are legal conclusions, bare assertions, or merely conclusory. *Id*. at 679–81. Second, the Court considers the factual allegations "to determine if they plausibly suggest an entitlement to

relief." *Id*. at 681. If the allegations state a plausible claim for relief, such claim survives the motion to dismiss. *Id*. at 679.

However, the Court need not accept conclusory allegations without supporting factual averments. *Southern Disposal, Inc., v. Texas Waste*, 161 F.3d 1259, 1262 (10th Cir. 1998). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. Moreover, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does the complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id*. (citation omitted). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id*. (citation omitted).

**Standard for Assessing Qualified Immunity under Section 1983**

42 U.S.C. § 1983 provides that "[e]very person who, under color of any statute . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." Section 1983 creates a "species of tort liability" that provides relief to persons deprived of rights secured to them by the Constitution. *Carey v. Piphus*, 435 U.S. 247, 253 (1978) (citation and quotations omitted).

In suits brought against officials in their individual capacities, officials may raise the defense of qualified immunity. *Kentucky v. Graham*, 473 U.S. 159, 166–67 (1985). The doctrine of qualified immunity protects government officials from individual liability

in the course of performing their duties so long as their conduct does not violate clearly established constitutional or statutory rights. *Washington v. Unified Gov't of Wyandotte Cty.*, 847 F.3d 1192, 1197 (10th Cir. 2017). Once a defendant has asserted a defense of qualified immunity, the burden shifts to the plaintiff who must establish that (1) the defendant violated a right, and (2) the right was clearly established. *Puller v. Baca*, 781 F.3d 1190, 1196 (10th Cir. 2015). "In their discretion, courts are free to decide which prong to address first in light of the circumstances of the particular case at hand." *Weise v. Casper*, 593 F.3d 1163, 1167 (10th Cir. 2010) (quotation omitted). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable [official] that his conduct was unlawful in the situation he confronted." *Mata v. Saiz*, 427 F.3d 745, 748 (10th Cir. 2005) (quoting *Holland v. Harrington*, 268 F.3d 1179, 1186 (10th Cir. 2001)).

A qualified immunity defense may be asserted in a Rule 12(b)(6) motion, although a motion for summary judgment under Rule 56 is the more common vehicle for asserting such defenses. *See Peterson v. Jensen*, 371 F.3d 1199, 1202 (10th Cir. 2004). In asserting a qualified immunity defense in their Rule 12(b)(6) motion, Defendants have set a higher bar for themselves: "a district court should not dismiss a complaint for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Petersen* v. *Jenson*, 371 F.3d 1199, 1201–02 (10th Cir. 2004) (internal citations and quotations omitted). In sum, asserting a defense of qualified immunity shifts the burden to the plaintiff, but doing so in the context of a 12(b)(6) motion materially lessens that burden.

## Qualified Immunity, the Eighth Amendment, and Deliberate Indifference

A prison official's deliberate indifference to an inmate's serious medical needs is a violation of the Eighth Amendment's prohibition against cruel and unusual punishment. *See Estelle v. Gamble*, 429 U.S. 97. 104 (1976); *Mata*, 427 F.3d at 751. It is clearly established in the Tenth Circuit that a delay in medical care constitutes an Eighth Amendment violation where the plaintiff can show the delay resulted in substantial harm. *Mata*, 427 F.3d at 751; *Kellum v. Mares*, 657 F. App'x 763, 768 (10th Cir. 2016).

The test for liability of prison officials for deliberate indifference to an inmate's serious medical needs, in violation of the Eighth Amendment, involves both an objective and a subjective component. *Mata*, 427 F.3d at 751. A plaintiff must first make non-conclusory allegations that the deprivation at issue was in fact sufficiently serious. *Id*. A medical need is "sufficiently serious" if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that "even a layperson would easily recognize the necessity for a doctor's attention." *Id*. (quoting *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000)).

"Where the necessity for treatment would not be obvious to a lay person, the medical judgment of the physician, even if grossly negligent, is not subject to second-guessing in the guise of an Eighth Amendment claim." *Id*. (citing *Green v. Branson*, 108 F.3d 1296, 1303 (10th Cir.1997)). In addition, a delay in a prisoner's medical care only constitutes an Eighth Amendment violation where the plaintiff can show the delay resulted in substantial harm. *Id*. The substantial harm requirement for a deliberate indifference claim may be satisfied by showing "lifelong handicap, permanent loss, or

considerable pain." *Id.* (quoting *Garrett v. Stratman*, 254 F.3d 946, 950 (10th Cir. 2001)).

The subjective prong of the test for deliberate indifference to an inmate's serious medical needs requires the plaintiff to present evidence (or, at the motion to dismiss stage, non-conclusory allegations) of the prison official's culpable state of mind. *Id.* at 751. The subjective component is satisfied if the accused official knows of and disregards an excessive risk to inmate health or safety. The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and she must also draw the inference. *Id.* A prison medical professional who serves as a "gatekeeper" for other medical personnel capable of treating a condition may be held liable under the deliberate indifference standard if she delays or refuses to fulfil that gatekeeper role. *Id.* at 757.

The standard for deliberate indifference to an inmate's serious medical needs lies somewhere "between the poles of negligence at one end and purpose or knowledge at the other." *Id.* at 752. The task of deciding on a motion to dismiss (without the affidavits that would be presented at summary judgment) whether an alleged constellation of facts constitutes deliberate indifference is made more difficult because "contemporary standards and opinions of the medical profession also are highly relevant in determining what constitutes deliberate indifference to medical care." *Id.* at 757–58 (citing *Howell v. Evans*, 922 F.2d 712, 719, *vacated after settlement by* 931 F.2d 711 (11th Cir. 1991)). For example, in *Mata*, in the context of summary judgment, the Tenth Circuit relied on expert affidavits and a CDOC health care publication to conclude that there were issues of fact as to whether a nurse knew that severe chest pain posed a serious risk of health

and the failure to act was reckless under acceptable medical norms. *Id.* at 759; *see also Kellum*, 657 F. App'x at 766 (affirming denial of prison official's motion for summary judgment on question of qualified immunity, citing expert medical evidence that five-hour delay in getting obviously sick inmate to hospital substantially worsened the inmate's condition, ultimately requiring heart surgery). On a motion to dismiss, the Court must accept as true the allegations of the Complaint, having no ability to look to expert reports or affidavits to assess the reasonableness or recklessness of the conduct of the DRDC medical professionals.

Deliberate indifference does not require a finding of express intent to harm. *Mata*, 427 F.3d at 752. Thus, a plaintiff alleging deliberate indifference to serious medical need not show (or allege) that a prison official acted or failed to act believing that harm actually would befall the inmate. It is enough that the official acted or failed to act despite knowledge of a substantial risk of serious harm. *Id.* This standard is akin to criminal recklessness, which makes a person liable when she consciously disregards a substantial risk of serious harm. *Id.* (citing *Farmer v. Brennan*, 511 U.S. 825, 836-38 (1994)).

The level of intent required for deliberate indifference to an inmate's serious medical needs can be demonstrated through circumstantial evidence. *Id.* "Whether a prison official had the requisite knowledge of a substantial risk to the inmate's health or safety is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.* (quoting *Farmer*, 511 U.S. at 542).

Accordingly, for Mr. Tanner to overcome Defendants' Motion, he is required to set forth non-conclusory allegations demonstrating that his medical need was objectively sufficiently serious, and that Defendants' delay in meeting that need caused him substantial harm. Then, to meet the subjective prong of the deliberate indifference test, Mr. Tanner must provide non-conclusory allegations supporting an inference that each Defendant knew about and disregarded a substantial risk of harm to his health and safety. *Id*. In a deliberate indifference case, it is enough when a plaintiff alleges "the specific medical symptoms and vital signs" presented to the medical provider, indicating "a need for further assessment, testing, diagnosis and emergency medical treatment. It is from these factual allegations that a plausible inference of deliberate indifference can be drawn." *Kellum*, 657 F. App'x at 770. "In terms of the subjective component, i.e., the requisite deliberate indifference, a plaintiff must establish that defendant(s) knew he faced a substantial risk of harm and disregarded that risk, 'by failing to take reasonable measures to abate it.'" *Hunt v. Uphoff*, 199 F.3d 1220, 1224 (10th Cir. 1999) (quoting *Farmer*, 511 U.S. at 834).

### Defendants' Arguments

Defendants argue that Mr. Tanner has not presented sufficient allegations of each specific Defendant's knowledge of Mr. Tanner's condition, or that each specific Defendant was deliberately indifferent to Mr. Tanner's condition. Citing *Perkins v. Kansas Department of Corrrections*, 165 F.3d 803 (10th Cir. 1999), Defendants emphasize that to be liable for deliberate indifference, a prison official "must both be aware of the facts from which the inference could be drawn that a substantial risk of harm exists, and he must draw the inference." *Id.* at 809. In addition, Defendants argue

that to state an actionable Eighth Amendment claim, an inmate must allege more than "ordinary lack of due care for the prisoner's interests or safety." *Farmer*, 511 U.S. at 835. Defendants argue that, when analyzed on an individual Defendant-by-Defendant basis, especially when viewed in the context of the nascent COVID-19 pandemic, Defendants were not deliberately indifferent as a matter of law. Defendants argue that they did provide care—including giving medicine to reduce Mr. Tanner's fever, oxygen to increase his oxygen saturation levels, and IV fluids to address his dehydration; taking vital signs on a regular basis before eventually x-raying lungs his lungs; and moving him to the hospital. At worst, Defendants say, their conduct represents either misdiagnosis or the erroneous interpretation of information. They claim they did not ignore Mr. Tanner or delay treatment for non-medical reasons, meaning that they cannot be found to have been deliberately indifferent in violation of the Constitution.

## ANALYSIS

### The Objective Prong of the Deliberate Indifference Analysis

First, as to the objective prong of a deliberate indifference claim, Mr. Tanner has adequately alleged that he was suffering from a sufficiently serious medical need that was deliberately or recklessly disregarded by DRDC medical personnel. The allegations of the Complaint, which I accept as true, are that Mr. Tanner was experiencing, for a period of nearly 36 hours, symptoms that even a layperson would recognize to require emergency room treatment or hospitalization. Indeed, the allegation is that his cellmate, a layperson, was so concerned about his condition that he repeatedly buzzed for medical assistance for Mr. Tanner—only to have those appeals for the most part ignored. Moreover, the recitation of the objective symptoms that Mr. Tanner was

experiencing,[5] coupled with the non-conclusory allegations that any reasonably trained medical practitioner would have recognized from these symptoms the need for immediate hospitalization, is sufficient to satisfy the objective prong.

In addition, putting aside the initial symptoms, the actual harm that Mr. Tanner ultimately suffered, including sepsis ultimately leading to loss of circulation in, and the amputation of, parts or all of his extremities, is sufficiently serious to satisfy the objective prong. *See Mata*, 427 F.3d at 753 (concluding that a deliberate indifference plaintiff can satisfy the objective prong of the analysis either by alleging alarming symptoms that were ignored (severe chest pain) or by pointing to the ultimate harm suffered (heart attack and permanent heart damage)); *Sealock*, 218 F.3d at 1210 (explaining that because the Eighth Amendment forbids unnecessary and wanton infliction of pain, an inmate's severe chest pain, coupled with a failure to get him treatment for several hours, sufficiently established the objective prong of the deliberate indifference standard).

### The Subjective Prong of the Deliberate Indifference Analysis

The Court next considers whether Mr. Tanner has sufficiently alleged Defendants' culpable states of mind. With respect to the subjective aspect of the deliberate indifference analysis, Defendants are correct that each Defendant's alleged knowledge and conduct must be analyzed. *See Mata*, 427 F.3d at 755–61 (analyzing separately the allegations of misconduct against various different prison nurses in deliberate indifference case). Thus, the Court will evaluate Mr. Tanner's allegations against each Defendant.

---

[5] This includes the high fever combined with splitting headache, loss of consciousness, extreme perspiration, need for sternal rub, high heart rate, belief he was dying, low pulse-oxygen level, and low blood pressure.

First, from a 20,000-foot view, this case is similar to (and arguably more egregious than) the one addressed by the Tenth Circuit in *Kellum*. Mr. Tanner's claimed symptoms at the beginning of his 36-hour ordeal match in many respects the alleged symptoms in *Kellum*, where an inmate presented to a correctional facility exhibiting "severe, obvious, recognizable symptoms—prolonged high fever and chills, demonstrable breathing problems, nausea, low blood pressure, poor skin color, and inability to walk or stand—which [the defendant nurse] must have known required medical attention and indicated a need for an ECG and other diagnostic testing to assess the reason for these symptoms." 657 F. App'x at 770. From these specific medical symptoms, it was apparent that there was a need for "further assessment, testing, diagnosis, and emergency medical treatment." *Id*. In *Kellum*, the Tenth Circuit upheld the lower court's ruling that a nurse's delay in acting to provide higher level of medical care in the face those symptoms stated a plausible § 1983 claim and defeated the defendant's motion for judgment on the pleadings.

Thus, "the symptoms displayed by the prisoner are relevant to the subjective component of deliberate indifference." *Mallory v. Jones*, Case No. 10-cv-02564-CMA-KMT, 2011 WL 1750234, at *5 (D. Colo. May 3, 2011). "The question is: were the symptoms such that a prison employee knew the risk to the prisoner and chose (recklessly) to disregard it?" *Martinez v. Beggs*, 563 F.3d 1082, 1089 (10th Cir. 2009).

In this case, Mr. Tanner plausibly alleges that the symptoms that he had, which each of the Defendants were aware of, were so serious that any reasonably trained medical person would have immediately recognized the need for emergency treatment at a hospital. Defendants argue that they did do some evaluations and did administer

some care, including providing some medicine to reduce his fever, oxygen via cannula or non-rebreather mask to increase his oxygen saturation levels, and IV fluids. Because they provided some medical care, Defendants argue, they cannot be charged with deliberate indifference to his serious medical needs in violation of the Constitution.

But Mr. Tanner's allegations are that in the face of his obvious, serious, life-threatening symptoms, the minimal treatment provided over his 36-hour ordeal came nowhere close to what was required and that Defendants failed in their gatekeeper role, preventing him from getting the hospital treatment he clearly required. On a motion to dismiss, and reading the plausible allegations in the Complaint in the light most favorable to Plaintiff, the Court (which lacks independent medical expertise and has no affidavits or expert reports from which to draw any conclusions) is in no position to find that Defendants' conduct does not, as a matter of law and fact, rise to the level of a constitutional violation.

If it were the standard that the provision of *some* medical care, no matter how inadequate, is enough to escape a deliberate indifference claim, then no civil rights complaint where a medical professional provided any response to a sick person would ever survive a motion to dismiss. This is not the law. For example, if an inmate were stabbed in the throat and had blood gushing from his jugular vein, merely providing a band-aid and telling the inmate to lie down and wait for the bleeding to stop would nevertheless constitute deliberate indifference because the presenting "medical symptoms and vital signs" would indicate a need for "emergency medical treatment." *Kellum*, 657 F. App'x at 770.

The allegations of Mr. Tanner's Complaint are effectively the same as the gushing vein scenario. Mr. Tanner asserts that to any reasonably trained medical practitioner, his symptoms from the very early morning when NP Mannon ordered tests "STAT" justified emergent treatment in a hospital context. These symptoms included very high fever, splitting headache, vomiting, and loss of consciousness. The tests were not done "STAT," but when Ms. Shkolnik arrived to do an evaluation later that morning, she found Mr. Tanner with very low oxygen saturation, an elevated pulse, elevated respirations, a temperature of 105.8, and change of mental status requiring a sternal rub. Per the allegations, "immediate medical attention outside the prison's capabilities" was required. But, in the face of these dire symptoms, neither Shkolnik nor NP Mannon took steps to move Mr. Tanner to a hospital.

Mr. Tanner also alleges that Dr. Maul was made aware of Mr. Tanner's abnormal vital signs and condition, but rather than immediately sending him to a hospital, Dr. Maul instead ordered a COVID test and put Mr. Tanner and his cellmate in isolation protocols. Regardless of whether Mr. Tanner had COVID, it is plausibly alleged that the severity of his symptoms mandated transfer to a hospital. Rather than being transferred, Dr. Maul left Mr. Tanner to languish for another day, observed only by his increasingly concerned cellmate.

Despite his alarming symptoms, Mr. Tanner was not seen by medical personnel again until 10:30 a.m. on March 16, 2020, when Nurse Supervisor Dora Molina assessed Mr. Tanner's condition and found him sitting hung over in a chair and becoming diaphoretic. Ms. Molina reported to NP Campbell that "Mr. Tanner was not doing well, that he was feeling poorly, and had diminished lung sounds." Based on this

report, NP Campbell (and Ms. Molina) knew Mr. Tanner needed higher-level evaluation and care than DRDC could provide, but NP Campbell did effectively nothing at that time, choosing not even to evaluate him due to COVID-19 fears. (Dkt. #1 at ¶ 71.) The Complaint alleges that NP Campbell, Ms. Molina, and Defendant HSA Cullyford jointly decided to keep Mr. Tanner on site, to defer provider assessment, and to follow up two hours later. (Dkt. #1 at ¶ 74.) NP Campbell charted, "make sure patient has oxygen on," but when Ms. Molina returned at 12:40 p.m., Mr. Tanner's oxygen was not in place and his oxygen saturation levels were critically low. (*Id.* at ¶¶ 76–77.) Given that Mr. Tanner had been in and out of consciousness and had experienced a change of mental status, it would not be surprising that Mr. Tanner was incapable of monitoring his own artificial oxygen supply. The alarming symptoms were again communicated to NP Campbell. But NP Campbell again chose to keep Mr. Tanner on site and provide minimal intervention, ordering only that Mr. Tanner receive an albuterol nebulizer and oxygen. (*Id.* at ¶ 81.) Although NP Campbell knew it was necessary to get an x-ray of Mr. Tanner's lungs, he again discussed the issue with HAS Cullyford and deferred having Mr. Tanner come to the clinic for an x-ray due to COVID concerns. (*Id.* at ¶ 82.)

By the time NP Campbell, Dr. Maul, and HSA Cullyford finally arranged for emergent transport to the hospital at 2:42 p.m. on March 16, 2020, 36 hours had elapsed since Mr. Tanner first presented with disturbing symptoms and, by then, he was close to death, ultimately suffering horrific and life-altering consequences.

I conclude that the Complaint plausibly alleges deliberate indifference to serious medical needs as to each of the Defendants. Mr. Tanner essentially paints a picture of a group of prison employees and medical officials who, while able to provide some level

of treatment and care at the DRDC, also served as gatekeepers for the higher level of

emergency room hospital care that Mr. Tanner required but was denied. *See Sealock*,

218 F.3d at 1211.

> As the Tenth Circuit explained in *Sealock* with regard to the gatekeeper function,

> The second type of deliberate indifference occurs when prison officials prevent an inmate from receiving treatment or deny him access to medical personnel capable of evaluating the need for treatment. *See Ramos*, 639 F.2d at 575. Ordinarily, a medical professional will not be liable for this second kind of deliberate indifference, because he is the person who provides the treatment. If, however, the medical professional knows that his role in a particular medical emergency is solely to serve as a gatekeeper for other medical personnel capable of treating the condition, and if he delays or refuses to fulfill that gatekeeper role due to deliberate indifference, it stands to reason that he also may be liable for deliberate indifference from denying access to medical care.

*Id.*. In *Sealock*, a claim of deliberate indifference was made against a physician

assistant who, in the face of an inmate's non-explained chest pains of which the

physician assistant was aware, allegedly failed to promptly send the suffering inmate to

the hospital. The inmate was later diagnosed as having had a heart attack. On summary

judgment, the Tenth Circuit agreed that the *Sealock* factual scenario adequately stated

a claim for deliberate indifference. "[The physician's assistant] knew that unexplained

chest pain posed a serious risk to appellant's health. Failure to summon an ambulance

would have disregarded that risk, arguably constituting deliberate indifference to a

serious medical need." *Id.* 1211–12.

Importantly, *Sealock* was decided on a motion for summary judgment. In this

case, we are only at the motion to dismiss stage where all of Mr. Tanner's allegations

are deemed true and Defendants' task in obtaining dismissal is even greater. *Peterson*,

371 F.3d at 1201 (asserting qualified immunity defense via Rule 12(b)(6) motion

subjects the defendant to more challenging standard of review than would apply on summary judgment). In his Complaint, Mr. Tanner plausibly alleges that that each of the named Defendants learned of his alarming vital signs over a period of many hours, that the Defendants knew they could not provide the level of care that his condition required, and that by failing to promptly send Mr. Tanner to the hospital, they intentionally and consciously abandoned their gatekeeper role, unnecessarily and recklessly delaying access to the emergency department treatment Mr. Tanner desperately needed.  Under the Rule 12(b)(6) standard, the Court will recommend that Defendants' Motion to Dismiss be denied.

## RECOMMENDATION

It is hereby **RECOMMENDED** that Defendants Motion to Dismiss (Dkt. #19) be **DENIED**.

**NOTICE: Pursuant to 28 U.S.C. § 636(b)(1)(c) and Fed. R. Civ. P. 72(b)(2), the parties have fourteen (14) days after service of this recommendation to serve and file specific written objections to the above recommendation with the District Judge assigned to the case. A party may respond to another party's objections within fourteen (14) days after being served with a copy. The District Judge need not consider frivolous, conclusive, or general objections. A party's failure to file and serve such written, specific objections waives de novo review of the recommendation by the District Judge,** *Thomas v. Arn***, 474 U.S. 140, 148-53 (1985), and also waives appellate review of both factual and legal questions.** *Makin v. Colo. Dep't of Corr.***, 183 F.3d 1205, 1210 (10th Cir. 1999);** *Talley v. Hesse***, 91 F.3d 1411, 1412-13 (10th Cir. 1996).**

**ORDER**

In light of my Recommendation, it is hereby **ORDERED** that the stay of discovery previously entered is lifted. Within five days from the date of this Order, the Parties should contact chambers to set the Scheduling Conference.

BY THE COURT

Date:  February 4, 2022
       Denver, Colorado

_____
N. Reid Neureiter
United States Magistrate Judge