IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior Judge Christine M. Arguello

Civil Action No. 21-cv-02340-CMA-NRN

CHRISTOPHER TANNER,

    Plaintiff,

v.

ZACHARY A. CAMPBELL, NP,
JILL M. MANNON,
ALLA SHKOLNIK,
DORA MOLINA, RN,
RANDOLPH MAUL, MD, and
TINA CULLYFORD, HSA,

    Defendants.

___

**ORDER AFFIRMING MAGISTRATE JUDGE RECOMMENDATION AND DENYING DEFENDANTS' MOTION TO DISMISS**

___

This matter is before the Court on the Recommendation of United States Magistrate Judge N. Reid Neureiter. (Doc. # 40). Judge Neureiter recommends that Defendants' Motion to Dismiss (Doc. # 19) be denied. Defendants object. (Doc. # 43). For the following reasons, the Court (1) overrules the Defendants' objection and affirms Judge Neureiter's Recommendation; (2) denies Defendants' Motion to Dismiss; and (3) denies as moot Plaintiff's Motion to Supplement His Response to Defendants' Objection to the Magistrate Judge's Recommendation to Deny the Defendants' Motion to Dismiss (Doc. # 79).

## I. BACKGROUND

This is a 42 U.S.C. § 1983 case alleging violations of the Eighth Amendment's prohibition on cruel and unusual punishment. (Doc. # 1 at ¶ 1). According to the Complaint, Plaintiff, Christopher Tanner, began experiencing severe bacterial pneumonia while he was an inmate at the Denver Reception and Diagnostic Center ("DRDC"), a correctional facility that houses prisoners with special medical needs. (Doc. # 1, ¶¶ 1, 13, 14). Mr. Tanner alleges that he was allowed to suffer in his cell for nearly 36 hours before he was finally transported to a hospital for treatment. (Doc. # 1, ¶ 88). As a result of this delay, Mr. Tanner contends, he ultimately lost most of his fingers and toes and portions of his hands and feet. (Doc. # 1, ¶ 1). Mr. Tanner is now suing members of the DRDC medical staff, alleging deliberate indifference to serious medical needs in violation of the Eighth Amendment.

Defendants moved to dismiss Mr. Tanner's claim for failure to plausibly allege a constitutional violation with respect to each individual Defendant. (Doc. # 19, pp. 3-14). Defendants also assert that they are entitled to qualified immunity. (Doc. # 19, p. 15). This Court referred the Motion to Judge Neureiter, who recommends denying the Motion. (Doc. # 40). In conjunction with his recommendation, Judge Neureiter lifted the stay of discovery in the matter. (Doc. # 40) Defendants now object to Judge Neureiter's recommendation and order lifting the stay. (Doc. # 43). The Defendants contend that Judge Neureiter erred by (1) failing to conduct a meaningful defendant-by-defendant analysis of the allegations; and (2) relying on distinguishable published and unpublished Tenth Circuit cases. (Doc. # 43, pp. 1-14.) Further, the Defendants argue that the stay

of discovery should be reimposed until the Court resolves the Defendants' Motion to Dismiss. (Doc. # 43, p. 14). The Court agrees with Judge Neureiter's recommendation and denies the Motion to Dismiss. Accordingly, the Court also affirms Judge Neureiter's order lifting the stay of discovery.

## II.   LEGAL STANDARDS

### A.   REVIEW OF A MAGISTRATE JUDGE'S RECOMMENDATION

Under 28 U.S.C. § 636(a)(1)(B), this Court may designate a magistrate judge to consider dispositive motions and submit recommendations to the Court. When a magistrate judge submits a recommendation, the Court must "determine *de novo* any part of the magistrate judge's [recommended] disposition that has been properly objected to." Fed. R. Civ. P. 72(b)(3).

### B.   DISMISSAL STANDARD UNDER FED. R. CIV. P. 12(b)(6)

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (emphasis added) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausibility, in the context of a motion to dismiss, means that the plaintiff pleaded facts which allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*.

"The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003) (citations and quotation marks

omitted). "A court reviewing the sufficiency of a complaint presumes all of plaintiff's factual allegations are true and construes them in the light most favorable to the plaintiff." *Hall v. Bellmon*, 935 F.2d 1106, 1108 (10th Cir. 1991). However, the court need not accept conclusory allegations without supporting factual averments. *Southern Disposal, Inc. v. Texas Waste*, 161 F.3d 1259, 1262 (10th Cir. 1998). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. "Nor does the complaint suffice if it tenders naked assertion[s] devoid of further factual enhancement." *Id.* (citation omitted).

### III.    DISCUSSION

**A.    DEFENDANT-BY-DEFENDANT ANALYSIS**

Defendants first contend that Judge Neureiter erred by failing to conduct "a meaningful defendant-by-defendant analysis" of Mr. Tanner's allegations. (Doc. # 43, p. 4). Had he done so, Defendants contend, he would have found that Mr. Tanner has failed to plausibly alleges deliberate indifference on the part of each of the Defendants. (Doc. # 43, p. 2). The Court disagrees.

1.    Legal Standard

The Eighth Amendment forbids government infliction of "cruel and unusual punishment[]." U.S. Const. amend. VIII. The federal courts have read this language to include an entitlement to a certain minimum standard of medical care while incarcerated. See *Estelle v. Gamble*, 429 U.S. 97, 101–05 & n.6 (1976). "Prison officials violate the Constitution when they act with deliberate indifference to an inmate's serious medical needs." *Estate of Beauford v. Mesa Cnty.*, 35 F.4th 1248, 1262 (10th Cir. 2022)

(citations and quotations omitted). Constitutional liability under the deliberate-indifference standard contains an objective and a subjective component. *See id.* (citing *Farmer v. Brennan*, 511 U.S. 825, 836 (1994)). "The focus of the objective component is the seriousness of the plaintiff's alleged harm, while the focus of the subjective component is the mental state of the defendant with respect to the risk of that harm." *Prince v. Sheriff of Carter Cnty.*, 28 F.4th 1033,1044 (10th Cir. 2022).

The objective component is satisfied if the prisoner's medical need was "sufficiently serious," that is: (1) has been diagnosed by a physician as needing treatment; (2) is so obvious a lay person could recognize the need for treatment; or (3) if a delay in medical care resulted in "substantial harm" such as lifelong handicap, permanent loss, or considerable pain. *Beauford*, 35 F.4th at 1262 (quoting *Farmer*, 511 U.S. at 934; *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000); and *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005)).

The subjective component is satisfied if the prison official had a culpable, deliberately indifferent state of mind as to the inmate's health or safety. *Beauford*, 35 F.4th at 1232. To be deliberately indifferent, the official must "know of and disregard[] an excessive risk to inmate health or safety," that is the official is (1) aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and (2) must also draw the inference. *Farmer*, 511 U.S. at 837. "Whether a prison official had the requisite knowledges of a substantial risk is a question of fact subject to demonstration in usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact

that the risk was obvious." *Beauford*, 35 F.4th at 1263 (citations and quotations omitted). "This is because if a risk is so obvious so that a reasonable man would realize it, we might well infer that the defendant did in fact realize it." *Id.*

    2.    <u>Analysis</u>

        a.    *Objective Prong*

Judge Neureiter determined – and the Court agrees – that the allegations in the Complaint satisfy the objective prong as to each Defendant. (Doc. # 40, pp. 19-20). Specifically, Judge Neureiter cites the following facts as demonstrating that Mr. Tanner's medical condition was sufficiently serious, obvious, and resulted in substantial harm: (1) Mr. Tanner was experiencing "symptoms that even a layperson would recognize to require emergency room treatment or hospitalization," including high fever, splitting headache, loss of consciousness, extreme perspiration, need for sternal rub, high heart rate, belief he was dying, low pulse-oxygen level, and low blood pressure; (2) a layperson, Mr. Tanner's cellmate, did in fact recognize the severity of Mr. Tanner's symptoms and repeatedly buzzed for medical assistance; and (3) the harm to Mr. Tanner, including sepsis resulting in partial amputation of parts of his extremities, was substantial. (Doc. # 40, pp. 19-20). The Court therefore affirms Judge Neureiter's findings with respect to that prong of the deliberate-indifference analysis.

        b.    *Subjective Prong*

Defendants argue, however, that Judge Neureiter failed to conduct an appropriate defendant-by-defendant analysis to determine whether Mr. Tanner's Complaint satisfies the subjective prong of the deliberate-indifference analysis.

Specifically, they contend that Judge Neureiter failed to properly determine (1) whether each defendant delayed treatment; and (2) whether each defendant had the requisite culpable mental state. (Doc. # 43, p. 5). The Court disagrees.

Judge Neureiter's Recommendation contains a detailed discussion of Plaintiff's allegations with respect to his medical condition and each Defendant's involvement. (*See generally* Doc. # 40, pp. 23-24). Specifically, Judge Neureiter's Recommendation discusses the nature of Plaintiff's symptoms; which symptoms were observable to each Defendant; why those symptoms demonstrated an obvious and substantial risk of serious harm to Plaintiff's health; and why such risk would have been obvious to any reasonable person. (Doc. # 40, pp. 23-24). Therefore, the Court finds no basis to reject Judge Neureiter's conclusion on that point.

Further, the Court has conducted its own de novo review of the allegations in the Complaint, and it finds that the Complaint contains sufficient allegations to support a finding of deliberate indifference with respect to each individual defendant:

        1.     <u>Defendant Zachary M Campbell, NP</u>

Mr. Tanner alleges that on March 16 at 10:30 a.m., Defendant Campbell knew that Mr. Tanner clearly needed higher-level evaluation and care than CDOC could provide. (Doc. # 1, ¶ 71). The Complaint alleges that Defendant Campbell was aware that low oxygen poses a risk of serious bodily injury if not addressed (Doc. # 1, ¶ 75), and that Defendant Campbell charted "make sure patient has oxygen on" (Doc. # 1, ¶ 76). Two hours later, Defendant Campbell was again informed of Mr. Tanner's alarming symptoms and vital signs (Doc. # 1, ¶ 80), and despite this information, Defendant

Campbell chose to keep Mr. Tanner onsite and provide minimal intervention, ordering only that Mr. Tanner receive an albuterol nebulizer and oxygen (Doc. # 1, ¶ 81). Mr. Tanner further alleges that Defendant Campbell knew it was necessary to take an x-ray of Mr. Tanner's lungs but "[d]iscussed with Tina HSA to continue to defer having patient come to clinic for x-ray" due to COVID concerns (Doc. # 1, ¶ 82).

Construing these allegations in the light most favorable to Plaintiff, Mr. Tanner has alleged facts that show that Defendant Campbell was aware of serious symptoms and delayed access to medical care despite his knowledge of a substantial risk of serious harm. *Mata*, 427 F.3d at 752. Accordingly, the Court finds that Mr. Tanner has stated an Eighth Amendment claim against Defendant Campbell.

2. <u>Defendant Jill M. Mannon</u>

Mr. Tanner alleges that the alarming nature of his condition was conveyed to Defendant NP Jill Mannon Keegan ("Mannon"), who then ordered several diagnostic lab tests, including a urinalysis, a CBC and a complete metabolic panel at approximately 6:00 am. (Doc. # 1, ¶ 27). NP Mannon made no notes about his condition at the time and did not record any vital signs. (Doc. # 1, ¶ 28). NP Mannon ordered these tests "STAT" meaning that the order was to be carried about immediately. (Doc. # 1, ¶ 29). Labs are ordered STAT when a provider knows that delay in receiving the ordered information poses an unreasonable risk of harm to the patient. (Doc. # 1, ¶ 30). Despite this order, however, the labs were not sent "STAT." (Doc. # 1, ¶ 30). Mr. Tanner was not moved to the medical unit or otherwise observed for the next several hours. (Doc. # 1, ¶ 31). Ms. Shkolnik apparently conveyed the abnormal vital signs to NP Mannon, who

ordered IV fluids and two (2) tablets of 500mg Acetaminophen by mouth three times daily as needed. (Doc. # 1, ¶ 44). Mr. Tanner plausibly alleges that NP Mannon knew over-the-counter pain medicine would not treat his underlying medical condition, (Doc. # 1, ¶ 45), and that any reasonably trained caregiver knows that IV fluids will not treat the cause of an infection or sepsis. (Doc. # 1, ¶ 46).

These allegations, construed in the light most favorable to Plaintiff, show that Defendant Mannon was aware of serious symptoms and delayed access to medical care despite her knowledge of a substantial risk of serious harm. *Mata*, 427 F.3d at 752. Accordingly, the Court finds that Mr. Tanner has stated an Eighth Amendment claim against Defendant Mannon.

### 3. Defendant Alla Shkolnik

Mr. Tanner also alleges that despite NP Mannon ordering the labs STAT, Defendant LPN Alla Shkolnik did not collect specimens until approximately 8:30 am – nearly three hours later. (Doc. # 1, ¶ 32). When Ms. Shkolnik arrived at Mr. Tanner's cell to collect the ordered blood and urine samples, she found him red and sweating and on the floor of his cell. (Doc. # 1, ¶ 33). Mr. Tanner told Ms. Shkolnik he was sick and "feels like he's going to die." (Doc. # 1, ¶ 34). Mr. Tanner reported to her that he had had a severe headache all day the day before, that he woke up around 3:00 am "because he was so hot, he layed [sic] on the concrete floor and then started throwing up," and that his cellmate had called for first responders because he had lost consciousness. (Doc. # 1, ¶ 35). According to the Complaint, Ms. Shkolnik repeatedly accused Mr. Tanner of having taken illegal drugs, disregarding his reported symptoms and instead baselessly

9

concluding Mr. Tanner was faking or responsible for his own illness. (Doc. # 1, ¶ 36). At approximately 8:30 am, Ms. Shkolnik found that Mr. Tanner had an elevated pulse, elevated respirations, very low oxygen saturations between 87 and 88%, and an extremely high temperature of 105.8. (Doc. # 1, ¶ 37.) A temperature of 100.4 or higher is considered a fever. (Doc. # 1, ¶ 38). All reasonable health care workers know that adults with a temperature over 103 F should be monitored, and that if a fever reaches 105 or is accompanied by severe headache or vomiting, immediate medical attention outside the prison's capabilities is required. (Doc. # 1, ¶ 38). Mr. Tanner plausibly alleges that all reasonably trained health care workers are aware that a fever of 105.8 is extremely high in an adult man and, especially in combination with vomiting, severe headache, and other abnormal vital signs, likely indicates a significant bacterial infection that requires higher level evaluation and treatment than can be provided in the prison. (Doc. # 1, ¶ 39).

Further, in an addendum authored the next day on March 16, 2020, Ms. Shkolnik recorded that at approximately 8:30 on the morning of the 15th, Mr. Tanner's oxygen saturation levels were dangerously low at 87-88% on room air and that Mr. Tanner was put on 1L of O2 via nasal canula. (Doc. # 1, ¶ 40). Mr. Tanner alleges that, because he could not maintain adequate oxygenation even with supplemental oxygen, Ms. Shkolnik would have understood that he was in a medical crisis. (Doc. # 1, ¶ 42). Despite obtaining multiple abnormal vitals, including very high temperatures, high pulse, fast respirations, and very low pulse oxygenation, Ms. Shkolnik charted Mr. Tanner's breathing was "adequate for rate and depth." (Doc. # 1, ¶ 43).

Ms. Shkolnik administered a blood draw and IV at approximately 9:00 am in Mr. Tanner's cell. (Doc. # 1, ¶ 47). While Mr. Tanner was being given IV fluids on the morning of March 15th, he was very nauseated and "started to dry heave after IV started." (Doc. # 1, ¶ 49). Mr. Tanner also had a significant mental status change during this period, (Doc. # 1, ¶ 49), becoming lethargic to the point that Ms. Shkolnik had to use a sternal rub to arouse him. (Doc. # 1, ¶ 51). A sternal rub is a pain technique employed to assess the consciousness level of a patient who is not responding to verbal stimuli or to arouse a person who cannot otherwise be aroused. (Doc. # 1, ¶ 52). Mr. Tanner further alleges that, despite having access to all this information suggesting that his medical condition was very serious, Ms. Shkolnik simply left him in his cell for hours. (Doc. # 1, ¶ 54). Ms. Shkolnik returned at approximately 11:00 am, removed Mr. Tanner's supplemental oxygen for four minutes, and charted that his saturation quickly dropped critically low to 87-88%. (Doc. # 1, ¶ 55.)

Construing these allegations in light most favorable to Plaintiff, Mr. Tanner has alleged facts that show that Defendant Shkolnik was aware of serious symptoms and delayed access to medical care despite his knowledge of a substantial risk of serious harm. *Mata*, 427 F.3d at 752. Accordingly, the Court finds that Mr. Tanner has stated an Eighth Amendment claim against Defendant Shkolnik.

    4.    <u>Defendant Dora Molina, RN</u>

The Complaint alleges that at approximately 10:30 am on March 16th, Defendant Nurse Supervisor Dora Molina assessed Mr. Tanner's condition. (Doc. # 1, ¶ 67). Ms. Molina charted that Mr. Tanner was "sitting hunged [sic] over in a chair upon arrival to cell room" and that he became diaphoretic about 45 minutes after she arrived. (Doc. # 1, ¶ 68). Mr. Tanner reported that for two days he had been experiencing a productive cough, difficulty breathing, body aches, loss of appetite, and pain to his right mid to posterior ribcage. (Doc. # 1, ¶ 69). Ms. Molina reported to Defendant NP Zachary Campbell that Mr. Tanner was not doing well, that he was feeling poorly, and had diminished lung sounds. (Doc. # 1, ¶ 70). Despite Mr. Tanner's symptoms, NP Campbell, Ms. Molina, and Defendant Health Services Administrator (HSA) Tina Culleyford jointly decided to keep Mr. Tanner onsite, "defer provider assessment," and follow-up in two hours. (Doc. # 1, ¶ 74). When Ms. Molina returned to assess Mr. Tanner again at approximately 12:40pm, his "oxygen was not in place." (Doc. # 1 ¶ 77). At that time, Mr. Tanner's saturation levels were critically low at 86% on room air. (Doc. # 1, ¶ 78). Ms. Molina charted that Mr. Tanner's blood pressure had dropped precipitously to 96/64, and that and his pulse and respirations were elevated. (Doc. # 1, ¶ 79). His lung sounds were diminished to the left and absent in the right. (Doc. # 1, ¶ 79). By about 2:20 pm, even after nebulizer treatment, Mr. Tanner's oxygen saturation levels "continue[d] to linger between 77% - 82%." (Doc. # 1, ¶ 85). Ms. Molina then started Mr. Tanner on a non-rebreather mask, a higher-level oxygen delivery device than the nasal canula, which she turned up to 15 liters of oxygen. (Doc. # 1, ¶ 86). Mr.

Tanner's "oxygen saturation [would] not go above 85%," even with the nonrebreather mask. (Doc. # 1, ¶ 87).

Construing these allegations in light most favorable to Plaintiff, Mr. Tanner has alleged facts that show that Defendant Molina was aware of serious symptoms and delayed access to medical care despite his knowledge of a substantial risk of serious harm. *Mata*, 427 F.3d at 752. Accordingly, the Court finds that Mr. Tanner has stated an Eighth Amendment claim against Defendant Molina.

### 5. <u>Defendant Randolph Maul, MD</u>

Mr. Tanner alleges that his abnormal vital signs and condition "were also apparently conveyed" to Defendant Maul, who ordered that Mr. Tanner receive a COVID test, but did not make any orders to send Mr. Tanner to the hospital. (Doc. # 1, ¶ 56). Further, Mr. Tanner alleges that, despite having access to information suggesting that Mr. Tanner's medical condition presented a serious risk to his health, it took nearly 36 hours after his cellmate had first called out for emergency medical attention for Defendant Maul to send Mr. Tanner to the hospital. (Doc. # 1, ¶ 88). Mr. Tanner also alleges that CDOC did not have nursing protocols relating to reacting to Mr. Tanner's critical vital signs, such as one for febrile inmates or suspected sepsis. (Doc. # 1, ¶ 114). Mr. Tanner further alleges that because CDOC did not have nursing protocols relating to reacting to Mr. Tanner's critical vital signs (Doc. # 1, ¶ 114), that Dr. Maul, as Medical Director for the Department of Corrections, was also deliberately indifferent in policymaking because no nursing protocols were in place for high fevers, identification or treatment of sepsis, or respiratory distress (Doc. # 1, ¶ 129).

Construing these allegations in light most favorable to Plaintiff, Mr. Tanner has alleged facts that show that Defendant Maul was aware of serious symptoms and delayed access to medical care despite his knowledge of a substantial risk of serious harm. *Mata*, 427 F.3d at 752. Accordingly, the Court finds that Mr. Tanner has stated an Eighth Amendment claim against Defendant Maul.

### 6. <u>Defendant Tina Cullyford, HSA</u>

Mr. Tanner alleges that NP Campbell knew it was necessary to take an x-ray of Mr. Tanner's lungs and "[d]iscussed with Tina HSA [Defendant Cullyford] to continue to defer having patient come to clinic for x-ray" due to COVID concerns. (Doc. # 1, ¶ 82). Ms. Cullyford and NP Campbell arranged to have a portable x-ray done in the multipurpose room. (Doc. # 1, ¶ 83). At 2:42 pm, nearly 36 hours after Mr. Sferrazza had first called out for emergency medical attention, NP Campbell, Dr. Maul, and Ms. Cullyford finally arranged for Mr. Tanner's emergent transport to the hospital. (Doc. # 1, ¶ 88).

Construing these allegations in light most favorable to Plaintiff, Mr. Tanner has alleged facts that show that Defendant Cullyford was aware of serious symptoms and delayed access to medical care despite his knowledge of a substantial risk of serious harm. *Mata*, 427 F.3d at 752. Accordingly, the Court finds that Mr. Tanner has stated an Eighth Amendment claim against Defendant Cullyford.

**B.    QUALIFIED IMMUNITY**

Defendants next argue that Judge Neureiter erred by declining to dismiss the case based on qualified immunity. Specifically, Defendants contend that Judge

Neureiter relied on "distinguishable published and unpublished Tenth Circuit cases to conclude that Plaintiff alleged a violation of clearly-established law." (Doc. # 43, p. 11). The Court agrees with Judge Neureiter.

"When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established." *Morris v. Noe*, 672 F.3d 1185, 1191 (10th Cir. 2012) (internal quotation marks omitted). However, when a qualified immunity defense is raised in a motion to dismiss, the defense is subject "to a more challenging standard of review than would apply on summary judgment," *Peterson v. Jensen*, 371 F.3d 1199, 1201 (10th Cir. 2004), as "it is the defendant's conduct as alleged in the complaint that is scrutinized," *Behrens v. Pelletier*, 516 U.S. 299, 309, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996) (emphasis omitted). Thus, to resolve a motion to dismiss based on qualified immunity, the Court asks only whether the conduct alleged in the complaint would establish a violation of a clearly established constitutional right. "To determine whether the right was clearly established, we ask whether the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Estate of Booker v. Gomez*, 745 F.3d 405, 411 (10th Cir. 2014) (internal quotation marks omitted).

Plaintiff's Complaint alleges facts which establish the violation of a clearly established constitutional right. "It is . . . clearly established in this circuit that a delay in medical care constitutes an Eighth Amendment violation where the plaintiff can show the delay resulted in substantial harm." *Kellum v. Mares*, 657 F. App'x 763, 767–68

15

(10th Cir. 2016) (citing *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005)); *see also Vigil v. Laurence*, 524 F. Supp. 3d 1120, 1130–31 (D. Colo. 2021) ("The weight of authority in the Tenth Circuit establishes that a prison official may not disregard a prisoner's pain, and that delay in treatment which worsens medical issues violates the Eighth Amendment." (citing cases)); *see also Jenkins v. Utah Cnty. Jail*, 2015 WL 164194, at *12 (D. Utah Jan. 13, 2015) ("a reasonable employee of a jail in the Tenth Circuit would have understood that delaying access to medical diagnosis or treatment for a serious medical condition, such as a broken bone, may rise to the level of deliberate indifference"). As discussed above and in Judge Neureiter's Recommendation, Plaintiff has alleged facts to show that Defendants violated Plaintiff's clearly established right to timely treatment of a serious medical condition, and that such right was clearly established in this circuit.

### C. OBJECTION TO ORDER LIFTING STAY OF DISCOVERY

Defendants next object to Judge Neureiter's order lifting the stay of discovery. (Doc. # 40, p. 27). They argue that discovery should be stayed until the Court issues a final order on the Motion to Dismiss. Because this Order resolves the Motion to Dismiss, Defendants' objection to the order lifting the stay is now moot and is therefore denied.

### D. MOTION TO SUPPLEMENT

Finally, Plaintiff seeks leave to supplement his response to Defendants' Objection. (Doc. # 79). This request is denied as moot.

### IV. CONCLUSION

16

For the foregoing reasons, the Defendants' Objection to Judge Neureiter's Recommendation (Doc. # 43) is OVERRULED and Judge Neureiter's Recommendation (Doc. # 40) is AFFIRMED and ADOPTED as an order of this Court. It is

FURTHER ORDERED that Defendants' Motion to Dismiss (Doc. # 19) is DENIED. It is

FURTHER ORDERED the Plaintiff's Motion to Supplement His Response to Defendants' Objection to the Magistrate Judge's Recommendation to Deny the Defendants' Motion to Dismiss (Doc. # 79) is DENIED AS MOOT.

DATED: September 2, 2022

BY THE COURT:

_Christine M. Arguello_
CHRISTINE M. ARGUELLO
Senior United States District Judge