**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

**Civil Action No. 21-cv-2340-CMA-NRN**

CHRISTOPHER TANNER, an individual,

  Plaintiff,

v.

ZACHARY A. CAMPBELL, NP, individually;
JILL M. MANNON, individually;
ALLA SHKOLNIK, individually;
TINA CULLEYFORD, HSA, individually;[1]

  Defendants.

_____

**RESPONSE TO DEFENDANT CAMPBELL'S MOTION FOR SUMMARY JUDGMENT**
_____

      The simple fact that there are multiple different versions of what happened to Mr. Tanner by the Defendants alone shows that the material facts are profoundly disputed. It is, however, undisputed that on March 16, 2020, NP Campbell (Campbell) was the provider with the authority to transfer Tanner out of Denver Diagnostic and Rehabilitation Center (DRDC) to the hospital for medical care. It is also undisputed that between 7:30 a.m. and 8:30 a.m. that morning, Tanner was discovered (having been denied treatment all day the day before when he was already hypoxic, tachycardic, tachypneic, diaphoretic, and hypotensive with labs confirming an infection) to again be hypoxic and "sitting hunged

_____

[1] Plaintiff has worked diligently to ascertain who was most responsible for the deliberate indifference at issue here, voluntarily dismissing several defendants, including Defendants Dora Molina, Randolph Maul, and Eleana Flores. The remaining defendants remain were all consciously aware of the risk of serious harm or death to Mr. Tanner, and knowingly delayed or denied him care causing him catastrophic injuries.

[sic] over in chair …. Became diaphoretic about 45 minutes after arrival …. Lung sounds diminished to left lobes and absent to right lobes." **Ex. 1**, p. 18[2].

Based on his critical condition, starting around 8:00 a.m. on March 16, Nurses advocated for Campbell and Health Services Administrator Tina Cullyford (Cullyford) to send him to the hospital without delay. Campbell chose not to go assess Tanner himself – Nurse Fuller swore "the provider [Campbell] wouldn't even go see him." She "had to be like 'he's dying'" to finally get him sent to the hospital, where he obviously needed to be since the day before. **Ex. 2**, p. 30. Campbell preferred his own comfort over his patient's health, refused to assess him, sent nurses in instead to do his job, and then refused to listen to their assessment that Tanner needed to be sent to the hospital. Despite the Nurses pleas starting early in the morning for him to be sent out, Campbell did not yield until around 2:30 p.m. At the hospital, Tanner was severely septic, requiring emergent intubation from untreated bacterial pneumonia, and ultimately lost most of his fingers and toes and portions of his hands and feet. Campbell's deliberate indifference and delay caused much more severe and permanent injuries than they would have been had he sent Tanner to the hospital when nurses told him it was an emergency.

## I. RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS ("SUMF")

**SUMF 1:** Plaintiff admits that a state of emergency was declared on March 11, 2020, and that the pandemic affected everyone's daily life, including prisoners and their medical providers. Plaintiff denies any implication that hospitals were unable or unwilling to treat respiratory patients at this time. **Ex. 3**, Dr. Beuther Report, pp. 7-8, 11-13. DRDC, on the

---

[2] *See* **Ex. 21**, Attorney Affidavit certifying true and correct copies of Exhibits.

other hand, with its limited resources, including lack of ventilators and lack of providers willing to assess patients, was not equipped to treat serious respiratory infections, whether it was COVID, which Tanner did not have, or pneumonia, which he did. *Id.*

**SUMF 2:** Admit.

**SUMF 3:** Admit.

**SUMF 4:** Admit in part. The Incident Report states that Officer Rogers learned of the medical emergency at "approx. 0705" on March 15, 2020. Defendant Nurse Alla Shkolnik (Shkolnik) charted she took Tanner's temperature at 7:05 a.m., and phone records indicate she was trying to call HSA Cullyford from DRDC starting at 6:00 a.m., thus Tanner must have declared a medical emergency *before* 7:05 a.m. to allow time for Shkolnik to get to and from the cell. **Ex. 4**, **Ex. 5**.

**SUMF 5:** Admit as to the content of the medical records; Deny that it occurred at 7:49 a.m. Shkolnik assessed Tanner by 7:05 a.m. on March 15, not 7:49 a.m., where he was red, sweaty, laying on the floor, and stated he felt like he was going to die. **Ex. 6**, Shkolnik Depo, 49:9-12; 54:1-17, 73:11-13, 157:14-18, **Ex. 1**, p. 2.

**SUMF 6:** Admit that Shkolnik contacted the on-call provider Defendant Mannon (Mannon), obtained the stated orders, and that the call log is quoted correctly. Plaintiff denies that he ever stated that he was "much better" or in "no pain." While his critically high temperature of 105.8 decreased as a result of Tylenol, he continued to deteriorate. He became lethargic, lost consciousness, and sicker throughout the day on the 15th while his progressing infection went untreated, which his cellmate observed. **Ex. 7**, Sferrazza Depo, 86:12-19. **Ex. 1**, p. 3. In fact, while Shkolnik claimed she based this "better"

impression in part on the "trend in his vitals," this is not credible as his oxygen levels were going down, and no other vital signs other than his temperature were taken between 8:30 a.m. on March 15 until almost 12:00 p.m. on March 16. **Ex. 6**, 165:3-166:18. *See* ADF #2.

**SUMF 7:** Admit. Plaintiff adds that all of these quoted vital signs are very abnormal.

**SUMF 7** also omits that Tanner had an alarming low blood pressure of 68/64, which Shkolnik testified was "very weak," and the best she could record because his blood pressure was "hard to hear." **Ex. 6**, 64:1-7, 159:23-160:2.

**SUMF 8:** Admit that Mannon ordered the referenced tests. Deny that the call log is accurate generally or as to timing. *See* Response to Mannon MSJ, ADF##30-32.

**SUMF 9:** Deny. At some point Shkolnik reported all of the abnormal labs, but phone records do not show a call to Mannon at 5:00 pm, and her "call log" is inaccurate. The abnormal lab results were likely conveyed earlier, around 2:30 – 3:00 p.m. **Ex. 5.** Plaintiff admits Tanner was given fluids the night of March 15 after yet another emergency was called for Tanner, which may have been ordered by Mannon. **Ex. 1**, p. 2-3.

**SUMF 10:** Admit the labs weren't entered right away, however, the labs were available in the electronic medical record as of the morning of March 16, 2020, as well as on the counter in the medical clinic and given to providers like Campbell through normal course. **Ex. 8**, Molina Depo 2, 68:6-8, 69:8-12.

**SUMF 11:** Admit.

**SUMF 12:** Admit.

**SUMF 13:** Admit. Shkolnik asked Nurse Dora Molina (Molina) to take Tanner's temperature the morning of the 16th because it was over 105 on the 15th. **Ex. 9**, Molina

Depo 1, 48:13-18. *See* Response to **SUMFs 21-25**.

**SUMF 14:** Admit Molina took Tanner's temperature at around 7:30 a.m. as stated in the record; deny that a temperature was taken later than this time. **Ex. 1**, pp. 17, 22, 24; **Ex. 8**, 33:4-34:5. **SUMF 14** itself contains a dispute between the record and testimony.

**SUMF 15:** Admit that after the 7:30 a.m. temperature on March 16, Molina did a more thorough assessment. Deny that the next recorded vital sign was not until 10:14 a.m. While there are no timestamps in Molina's narrative, she testified that Tanner had very low pulse oxygen levels at her initial assessment around 8:00 a.m. on March 16, 2020. **Ex. 8**, 97:3-100:3, 104:6-105:3. Molina then told Campbell about these dangerously abnormal vitals shortly after they were obtained. *See* **Ex. 8**, 104:6-105:3.

**SUMF 16:** Admit Nurse Alison Fuller (Fuller) was training with Molina and that the only vital sign attributed in the record to her is the temperature at 10:14 a.m. Deny it is the only vital sign recorded, as there are other vital signs recorded on the 16th in Molina's narrative note and the vitals section. **Ex. 1**, pp. 17-18; **Ex. 8**, 97:3-100:3, 104:6-105:3.

**SUMF 17:** Admit Campbell was the provider on duty March 16, 2020. Deny any implication that he was only responsible for taking calls or responding to emergencies. As the provider on duty, Campbell was supposed to see, assess, and diagnose sick inmates (like Tanner), and send them to the hospital. **Ex. 10**, Maul Affidavit ¶¶3, 9, 18.

**SUMF 18:** Deny. While Cullyford and Campbell decided that Campbell would not assess and treat Tanner on March 16, Plaintiff denies that this decision was made before then by "chiefs of operations." Dr. Randolph Maul, CDOC's Chief Medical Officer, swore that he was not involved in the decision that Campbell not assess Tanner. **Ex. 10**, ¶17.

Mannon, who was on call Sunday March 15, testified that she ordered Tanner to be seen the next day by the Provider of the Day, contradicting Campbell's assertion that the decision not to have all providers see patients suspected of COVID had been made the week before and relayed to the providers. **Ex. 8**, 105:15-106:9; **Ex. 6**, 32:18-33:1; 55:5-25; **Ex. 11**, Cullyford Depo, 98:10-20; **Ex. 12**, Mannon Depo, 163:14-21. Plaintiff also denies any implication that this decision was made for inmates' safety – it was designed to protect Campbell. Thus, after spending the day with Tanner, Molina, who also did not have a fitted N95, came back to work, continuing to see her infirmary patients, including those with cancer, the most at-risk people in DRDC. **Ex. 9**, 135:8-17; **Ex. 11**, 53:24-54:2.

**SUMF 19:** Admit there was limited PPE and Campbell did not have an N95 mask because when they tried to fit him one, he could still smell through it and they determined it didn't fit properly. **Ex. 11**, 94:14-19. Deny this is a material fact because it was decided by Cullyford that Campbell, as a provider, would not go into the cell regardless of whether they had properly fitting masks. **Ex. 11**, 98:14-22. Further, N95 masks were not required to go into Tanner's cell as nurses were being sent in without such protection. **Ex. 2**, p.4

**SUMF 20:** Admit that there was significant uncertainty with respect to the treatment of people with COVID at the time. Deny the rest of the paragraph – Campbell's self-serving testimony cannot create an undisputed material fact. It was so early in the pandemic that there were not even any cases in Denver yet, let alone a concern about ventilator capacity. Campbell's testimony is strongly contradicted by Plaintiff's Expert David Beuther, MD, PhD, Chief Medical Information Officer at National Jewish Health. Dr. Beuther makes clear that even at the worst of the pandemic, which came long after March

16, 2020, "never in the State of Colorado did we ever have to deny someone a ventilator."

Dr. Beuther also opined:

> at this time, all local Emergency Departments were open for business and able to see patients just like Mr. Tanner. The reasons for individuals to stay home was precisely so that sick patients like Mr. Tanner could be evaluated in the emergency department, not to deny sick patients the care they clearly needed…. I can assure everyone in this case that while this was not a time of business as usual, this was not the peak of the pandemic in Denver, and there was willingness and capacity to see Mr. Tanner at most local emergency departments on 3/15/20 and 3/16/20. Resource limitations at local emergency departments were not a reasonable excuse for keeping Mr. Tanner at DRDC and providing him substandard and reckless care.[3]

**SUMF 21:** Admit Molina spoke to Campbell after her initial assessment of Tanner. Deny that this conversation took place at 10:30 a.m. Molina took Tanner's temperature at 7:30 a.m. because she was specifically asked to by Shkolnik. **Ex. 1**, p. 17; **Ex. 8**, 62:3-5, 68:11-15. Molina also did a further nursing assessment of Tanner and relayed all of her nursing assessment and findings to Campbell around 8:00 a.m. **Ex. 8**, 97:3-100:3, 104:6-105:3. During this conversation Molina told Campbell that Tanner had *lost* lung sounds in one lung, had diminished sounds in the other lung, his pulse oxygen levels were dropping extremely low to 77%, and that he needed to see Tanner or send him to the hospital immediately. **Ex. 8**, 98:20-100:3. After hearing that Tanner was crashing and needed to be hospitalized, Campbell and Cullyford jointly decided to "defer" provider evaluation and send her back in two hours for follow-up assessment. **Ex. 1**, p. 23.

**SUMF 22:** Deny. The testimony of Nurses Molina and Fuller blatantly contradict

---

[3] **Ex. 3**, pp. 7-8, 10. Dr. Maul also testified that if a provider could not conduct an in-person assessment of an inmate, then the provider should send the inmate to the hospital to get the necessary provider assessment. **Ex. 13**, Maul Depo, 127:18-128:6. **Ex. 10**, ¶18.

Campbell's self-serving testimony that Tanner was "stable." Campbell did not even go see Tanner. Knowing that his patient was showing signs of critical illness, he refused to see him, diagnose him, or send him to a hospital. Instead, he went to talk to Cullyford, who had actively prevented Tanner's hospitalization the day before. **Ex. 6**, 58:6-14, 65:23-69:9; **Ex. 9**, 173:23-175:12. Campbell chose not to assess Tanner himself, instead relying on the "eyes and ears" of the nurses but ignoring them both telling him that Tanner needed to be sent out and was critically ill at that time. **Ex. 1**, pp. 17-18. **Ex. 8**, 97:3-100:3; **Ex. 14**, Fuller Affidavit, ¶¶12-17; **Ex. 15**, Fuller Depo, 76:10-14. Tanner was "the picture of an unstable patient requiring prompt an immediate treatment at a facility equipped to treat sepsis" since the morning of the 15th. **Ex. 16**, Dr. Gelfand Report, p. 13.

**SUMF 23:** Admit that Molina gave differing testimony about the timing of when she first told Campbell of Tanner's condition and that he needed to go to the hospital, especially once the existence of Nurse Fuller's damaging text messages came to light. These different accounts only support that this fact is *disputed*, not *un*disputed.

**SUMF 24:** Admit. Molina told Campbell that he "need[ed] to see him." **Ex. 8**, 122:10-15.

**SUMF 25:** Deny. Molina told Campbell at 8:00 a.m. that Tanner was hunched over and could not maintain oxygen saturations, that she could not hear lung sounds on one side of his lungs, and could barely hear them on the other side. **Ex. 8**, 98:20-99:24; 103:14-105:3, 125:15-25. Molina told Campbell that he needed to be seen by a provider and to go to the hospital. **Ex. 8**, 43:11-19, 122:15-16; 126:6. While she may not have used the precise word "emergency" or "severe respiratory distress," abnormal vital signs and lack of lung sounds are clearly evidence of severe respiratory distress. A low oxygen level like

this is "an objective sign that there is a serious cardiac or pulmonary condition, and nothing was done to evaluate or treat that aspect of his presentation, it never improved and the only defense seems to be the unacceptable notion that they decided to accept recklessly substandard care because the COVID-19 pandemic made things more difficult." **Ex. 3, p.** 12.  Likewise, as soon as Fuller saw Tanner, she "knew he needed to go to the hospital right away." He was "hunched over, could barely speak due to the difficulty he was having breathing. . . . He appeared to be in severe respiratory distress." **Ex. 14** at ¶12-13. Fuller told Campbell that Tanner was in severe respiratory distress the morning of March 16, stressing "in explicit terms, that Mr. Tanner needed emergency medical assistance at the hospital." **Ex. 14**, ¶17. **Ex. 9**, 122:15-16**.** Fuller was "horrified by what [she] saw happen to Mr. Tanner at DRDC." She didn't even need "any specialized training whatsoever, on the morning of March 16, to know we had a man in a serious medical crisis who clearly needed to be sent to the hospital immediately." **Ex. 14**, ¶25.

**SUMF 26:** Deny. Tanner was not able to talk clearly, was not stable, and was in obvious distress. Tanner "was unstable from the first time [Allison Fuller] observed him… nothing he presented that day would [Ms. Fuller] document as a stable condition." Tanner "was having a hard time talking because of his state." **Ex. 15**, 76:5-7, When the chest x-ray was finally done, Tanner was not even able to walk by himself and relied on his cellmate to carry him. "At no point" did Tanner say he was feeling better. According to his cellmate, Tanner "kept getting worse and was talking … about his fear that he was going to die," "crying and asking … if he was going to die" – by evening on March 15 they stopped talking much because "he was so sick that he wasn't really communicating." **Ex. 7**, 44:24-

25; 48:8-12; 55:5-21; 86:15-19. *See also* **Ex. 3**, p. 15 ("It is not clear to me why we hear of conflicting reports that Mr. Tanner was talking freely and not in any distress, yet he had profound hypoxemic acute respiratory failure and was immediately intubated at the University of Colorado. The objective evidence conflicts with subjective reports of his status, raising substantive doubt about the accuracy of subjective reports.").

**SUMF 27:** Admit the labs ordered the previous day had come in and were on the counter. While Molina testified she did not discuss the labs with Campbell, they were on the counter and an order for STAT labs was in Tanner's DRDC's electronic medical record readily available to Campbell. It was also Molina's impression that "somebody else gave them to him, the providers seen them." **Ex. 8**, 131:13-19.

**SUMF 28:** Admit that the lab results were not entered into the electronic record, but deny that Campbell was not aware of them. These labs were sitting on the counter and available to Campbell. **Ex. 8**, 131:13-19. Plaintiff is also entitled to the reasonable inference that Campbell knew that labs were ordered and received on March 16, as he testified "my general practice was to always look at – I shouldn't say 'always.' My general practice was to review records as much as I could to get an idea what's going on previously up to now." **Ex. 17**, Campbell Depo, 65:15-19. Campbell testified that March 16 "was a really calm day" and that Tanner "was my focus of this day," thus he had plenty of time to engage in his general practice of reviewing his patient's medical records. **Ex. 17**, 146:2-3; 171:3. Here, Tanner's records showed that STAT labs (meaning results needed within 4 hours) were ordered the day before, and thus it is a reasonable inference that he either reviewed the labs or knew the results were back and available. **Ex. 1**, p. 3.

**SUMF 29:** Deny. Campbell did not ask Molina to get Plaintiff's vital signs and did not order oxygen at 10:30 a.m. on March 16. Molina had already obtained these abnormal vital signs *before* talking to Campbell, and the supplemental oxygen was already in his cell. **Ex. 8**, 40:7-25, 98:9-11. Molina told Campbell about Tanner's very low pulse ox and absent lung sounds around 8:00 a.m. **Ex. 8**, 98:20-100:3; 42:20-43:19. Campbell discussed Tanner with Molina again around 10:30 a.m. and told her that instead of her request to have Tanner seen by a person who could diagnose and to go to the hospital, that they would just wait and have her check him again in 2 hours. **Ex. 9**, 131:18-132:2.

**SUMF 30:** Deny that the quoted vitals were obtained two hours after the events described in SUMF 29, because SUMF 29 is also denied. Plaintiff admits that at around 11:52 a.m., Molina obtained a high pulse of 112, a high respiration of 22, a low blood pressure of 96/64, and a very low blood oxygen level of 86%. **Ex. 1**, p. 17.

**SUMF 31:** Deny. Nurses Molina and Fuller both told Campbell repeatedly throughout the day on March 16th that Tanner needed to go to the hospital. *See* Response to SUMF 25.

**SUMF 32:** Deny. While Plaintiff admits that Tanner was found not to have oxygen on at times on March 16, he did not have the capacity to be "compliant" or "not complaint" because he was so critically ill. **Ex. 3**, p. 2 ("severe acute illness associated with low blood pressure and hypoxemia can render a previously competent patient incompetent.").

**SUMF 33:** Plaintiff admits that Campbell ordered an Albuterol nebulizer and oxygen but denies these breathing treatments all occurred at 12:14 p.m. Regardless, it was critical for Campbell to have Tanner diagnosed and treated for why he was hypoxic and requiring continuous supplemental oxygen. **Ex. 16**, p. 13. After again obtaining critically abnormal

vital signs and Tanner continuing to deteriorate, the nurses again told Campbell that Tanner needed to go to the hospital. Campbell "gave [them] some pushback and instead ordered Nurse Molina to try other breathing support interventions on Mr. Tanner." **Ex. 14**, ¶18.It was obvious to Nurse Fuller that "these interventions would not reverse his underlying disease process or prevent the need for him to be transferred to the hospital." *Id.* Fuller was "shocked by [Campbell's] reaction because it was very clear to [her] that DRDC did not have the capability, given the limitations of that clinical setting, to provide Mr. Tanner with the medical care he needed to stay alive." *Id.* ¶19 By the time the logistics of the chest x-ray were arranged at 2:00 p.m., more than 30 hours after Tanner first declared a medical emergency, he was so sick that his cellmate had to carry to him to the x-ray because he couldn't walk, his skin was pale and discolored, he couldn't really talk and his words were more of a mumble. **Ex. 7**, 60:5-20; 62:19-63:9; **Ex. 3**, pp. 4-5, 12.

**SUMF 34:** Deny that this conversation did not happen until 2:18 p.m. Molina learned that Tanner's oxygen saturation was critically low (77%) with a nasal canula at around 8:00 a.m., which she told Campbell "right after." She "didn't wait until 2:18 to tell Zach Campbell that." **Ex. 8**, 104:6-105:3. Molina and Fuller told Campbell that Tanner needed to go to the hospital throughout the day, not just at 2:18 p.m. **Ex. 15**, 63:1-5.

**SUMF 35:** Admit that Molina knew that Tanner's low oxygenation required him to be hospitalized. Deny that Tanner was speaking in full sentences. He was having trouble talking and was in obvious respiratory distress. **Ex. 15**, 76:5-6 ("he was having a hard time talking because of his state"); **Ex. 7**, 62:19. By the evening of March 15, he was "so sick that he wasn't really communicating." **Ex. 7**, 55:20-21.

**SUMF 36:** Deny. Campbell knew that Tanner was not able to maintain his oxygenation since approximately 8:00 a.m. that morning. Fuller was "horrified" by Campbell's reaction. She and Molina spent most of the day with Tanner. **Ex. 14**, ¶¶20-25. Despite their "persistent" efforts to "convince the NP to send Mr. Tanner to the hospital, way too many hours passed before the ambulance was called" so that he could receive "the lifesaving care that he so desperately needed." **Ex. 14**, ¶26. The only reason Campbell finally ordered Tanner to be sent to the hospital at around 2:30 p.m. was because the nurses told him Tanner was "dying" and insisted he be sent out. **Ex. 2**, p. 30, **Ex. 8**, 135:12-15. Tanner was near death at the time of transfer. **Ex. 3**, p. 14. Indeed, he was obviously septic the morning before and in need of emergent treatment. **Ex. 16**, p. 13.

**SUMF 37:** Deny. Tanner's emergent condition had been known to Campbell since approximately 8:00 a.m. *See* response to SUMF 36. Tanner's dire and emergent condition had been known to Cullyford since around 7:00 a.m. on March 15, and she blocked him from going to the hospital since the day before. **Ex. 6**, 58:6-14, 65:23-69:9.

**SUMF 38:** Deny that Campbell decided to send Tanner to the hospital on his own. *See* SUMF 36. Plaintiff admits Tanner's lung was so full from pneumonia on xray that a mass couldn't be excluded. **Ex. 1**, p. 29.

**SUMF 39:** Admit. *See also* Response to SUMF 25, 33.

**SUMF 40:** Admit that Fuller told Campbell "in explicit terms that Mr. Tanner needed emergency medical assistance at the hospital," and that she had a similar conversation between breathing treatments. However, this was not the first or only conversation Fuller had with Campbell. Fuller had multiple conversations with Campbell on March 16 about

Tanner's deteriorating condition and need to be sent out. *See* Response to SUMF 25, 33.

**SUMF 41:** Admit that Fuller advocated all day to have Campbell send Tanner to the hospital. Deny she only spoke to Molina and Campbell about Tanner. The morning of March 16, 2020, Nurses Fuller and Molina both arrived at around 6:00 a.m. They attended a meeting of nurses from the night shift about what happened overnight. Fuller learned that Tanner looked "horrible," had a very high fever and was unable to maintain a safe blood oxygen level. **Ex. 2**, pp. 34-35; **Ex. 8**, 17:12-14, 33:4-25, 112:11-19; **Ex. 9**, 56:24-57:1; **Ex. 14**, ¶¶ 9-10; **Ex. 15**, 35:6-37:17, 107:11-17.

**SUMF 42:** Admit. *See* ADF #8.

**SUMF 43:** Admit.

**SUMF 44:** Admit that Tanner's injuries required amputation of portions of his hands and feet. Plaintiff denies any implication that these injuries are normal complications of his illness, rather than the deliberately indifferent delay in transfer for treatment. *See* ADF #9.

## II. STATEMENT OF ADDITIONAL DISPUTED FACTS (ADF)

**ADF 1:** As of the early morning on March 15, 2020, Tanner was suffering from bacterial pneumonia. This infection went untreated, and, thus, progressed until he was emergently intubated at UCHealth at 3:50 p.m. on March 16, 2020. **Ex. 16**, pp. 12-14.

**ADF 2:** In 2020, DRDC nurses on the night shift were assigned only to the infirmary; there were no nurses in the clinic or seeing patients in regular housing. **Ex. 8**, 11:22-25. Nurses would only be aware of the condition of someone outside of the infirmary (like Tanner) if an emergency was called. **Ex. 8**, 12:3-13. Plaintiff's cellmate testified he called several medical emergencies for Tanner, although he can't remember the exact time. **Ex. 7**,

90:21-24, 34:10-36:1. Medical emergencies continued to be called for Tanner, which explains why the night nurses saw him. **Ex. 22**.

**ADF 3:** Campbell came on shift around 6:50 a.m. on March 16. **Ex. 18**. NP Mannon testified that she "asked the provider on site in the morning to evaluate" Tanner. **Ex. 12**, 163:14-21. Mannon also testified that she ordered a chest x-ray for the morning of March 16, 2020. **Ex. 12**, 167:20-25. If true, this means that Campbell knew he had to see Tanner and get him a chest x-ray when he came in that morning at 6:50 a.m. but chose not to.

**ADF 4:** In the face of critically abnormal vital signs and two nurses adamantly saying Tanner needed to be hospitalized, Campbell chose not to send him out or even go assess him despite knowing of Tanner's alarming vital signs the day before. Plaintiff is entitled to the reasonable inference that Campbell reviewed all of these abnormal vitals from the day before, as he testified it was his "general practice" to review records of his patients and it was a "calm" day for him workwise. **Ex. 17**, 65:15-19; 171:3.

**ADF 5:** Campbell knew that these vital signs were still extremely abnormal and the failure to treat him could cause serious injury or death. Inability to maintain blood oxygenation is an emergency symptom of life-or-death importance. **Ex. 3**, p. 5 ("The decision to transfer [Tanner to the hospital] should have occurred when his oxygen first remained low, over 30 hours earlier, the morning of 3/15/20…."). Campbell admitted that the vitals in the record prior to 8:00 a.m. on March 15 were all abnormal and concerning and meant that Tanner met SIRS criteria –a "well known calculator that's developed to help practitioners identify … as early as possible that someone might be headed toward sepsis" and that well known dangers from sepsis are "death" or "organ failure." **Ex. 17**, 79:13-81:14.

Campbell admitted that Tanner's low pulse oxygenation numbers that Molina told him about meant that Tanner needed to go to the hospital because "he needs more than what we can offer here in the clinic; he needs to go out." **Ex. 17**, 152:16-21. He testified that he didn't believe Tanner's oxygenation was 77 before 2:18 p.m. *Id.* But Molina testified it was 77% at approximately 8:00 a.m. **Ex. 17**, 152:16-21; **Ex. 8**, 103:14-105:3.[4]

**ADF 6:** Dr. Maul testified if an inmate meets SIRS criteria, then he expects that they would be sent to the hospital. **Ex. 13**, 66:24-67:6. He testified that even a suspicion of sepsis should trigger empiric treatment with antibiotics before the precise identification of the bacteria causing the sepsis is done. *Id.* at 39:7-11. Maul makes clear that "a patient who meets the criteria for SIRS or Sepsis needs to be sent to the hospital." **Ex. 10**, ¶14.

**ADF 7:** Cullyford and Campbell decided to "defer" provider assessment while knowing this risked Tanner's life. Dr. Beuther opined that: "[t]here was not a single non-serious explanation for the constellation of symptoms exhibited by Mr. Tanner. Any health care provider would be aware of the significant risk of death to him of continuing to maintain him at DRDC. . . Providers are ethically obligated to take on some measured risk to care for their patients . . . you can either take care of the patient or you can send them to someone who can. What you cannot do, and what is clearly unethical, is to neglect and abandon the patient basic and necessary care." **Ex. 3**, pp. 7-8.

**ADF 8:** An ambulance was finally called at 2:42 p.m., almost a half-hour after Campbell testified that he 'decided' to send Tanner to the hospital. **Ex. 17**, 153:19-21. When AMR

---

[4] Maul testified that if his staff want to hospitalize a patient, his response is: "You're there. You have boots on the ground, and I trust your judgment. If you feel that he needs to go to the hospital, then by all means, he needs to go to the hospital." **Ex. 13**, 28:24-29:16.

arrived at Tanner's bedside, his vitals were terrible: very high blood pressure (160/130), extremely high pulse (126), and very fast respirations (26). His pulse oxygen level was very low even with maximum oxygen. **Ex. 19**, p. 2.

**ADF 9:** The delay in treatment caused significant pain, septic shock, and loss of his extremities. **Ex. 3**, p. 15 (In my expert medical opinion. . .deciding to transfer Mr. Tanner out on 3/15/20 instead of 3/16/20 would have substantially reduced his risk of severe refractory septic shock and prolonged mechanical ventilation and was a significant contributing factor in his preventable limb ischemia. Every minute of delay worsened his prognosis, causing him preventable injuries."); **Ex. 16**, p. 13 ("It is my opinion that, had he been sent to the ED at that point in time [morning of March 15, 2020], up to and including the morning of March 16, 2020, and received the appropriate treatment for sepsis, Mr. Tanner would have avoided septic shock and loss of his extremities.").

## III.  CAMPBELL VIOLATED A CLEARLY ESTABLISHED CONSTITUTIONAL RIGHT

Inmates have a clearly established Eighth Amendment right to be free from deliberate indifference to their known serious medical needs. *Estelle v. Gamble*, 429 U.S. 97 (1976). Deliberate indifference is shown when a defendant "knows of and disregards an excessive risk to [a detainee's] health or safety." *Olsen v. Layton Hills Mall, 312 F.3d 1304*, 1315-16 (10th Cir. 2002).[5] Constitutional liability under the deliberate-indifference standard contains an objective and a subjective component. "The focus of the objective component is the seriousness of the plaintiff's alleged harm, while the focus of the subjective component is the mental state of the defendant with respect to the risk." *Prince*

---

[5] Campbell does not challenge the objective component of the claim. Motion p. 14.

*v. Sheriff of Carter Cty.,* 28 F.4th 1033, 1044 (10th Cir. 2022).

Here, Plaintiff has put forth a surfeit of evidence showing that Campbell "kn[ew] of and disregard[ed] and excessive risk to [Tanner's] health." *Olsen*, 312 F.3d at 1315-16.[6] As of 8:00 a.m. on March 16, Campbell knew that Tanner had very low oxygen levels, absent lung sounds, abnormal vital signs, and was so ill two nurses (the only ones who actually assessed him that day) said he needed to be immediately hospitalized, and, despite this information, Campbell chose not to assess Tanner and kept him onsite. Campbell admits he probably read the record, meaning that he also knew Tanner had a fever of almost 106 the day before, similar problems maintaining oxygen, and that the absent lung sounds was a significant worsening in his condition. For the next six hours, nurses continued to ask Campbell to send him to the hospital as breathing treatments were not going to save his life, yet Campbell refused. These well-supported facts show that Campbell was aware of serious symptoms and delayed access to medical care despite his knowledge of a substantial risk of serious harm. *Mata,* 427, F.3d at 752.

Everyone who actually laid eyes on Tanner knew he needed to be immediately hospitalized. "[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer v. Brennan*, 511 U.S. 825, 842 (1994). Nurse Fuller, a nurse whose identity was hidden from Plaintiff for over a year, has sworn that Tanner was so sick the morning of March 16, 2020 that she "didn't need any

---

[6] A jail official knew an inmate faced a substantial risk of significant harm if she (1) was aware of the inmate's symptoms or condition; and (2) knew that such symptoms or condition posed a substantial risk of significant harm to the inmate's health. *Mata v. Saiz*, 427 F.3d 745, 758-59 (10th Cir. 2005).

specialized training whatsoever … to know we had a man in a serious medical crisis who clearly needed to be sent to the hospital immediately." **Ex. 14**, ¶25. Plaintiff's experts also strongly support that this course of care was deliberately indifferent, even those whose reports were due *before* the hidden text messages and affidavit from Fuller were obtained through Plaintiff's own investigation. **Ex. 20**, Dr. Roscoe Report, p. 15.

Defendant's contentions that Campbell's conduct amounts to "mere misdiagnosis" or a "disagreement between two health care professionals" are misleading. Motion, p. 13. Campbell didn't diagnose Tanner. Rather, he *refused* to see him and diagnose him, and then barred the gate when nurses advocated for their patient, until they finally overruled him. As the Tenth Circuit explained:

> The second type of deliberate indifference occurs when prison officials prevent an inmate from receiving treatment or deny him access to medical personnel capable of evaluating the need for treatment. *See, e.g.*, *Ramos*, 639 F.2d at 575. Ordinarily, a medical professional will not be liable for this second kind of deliberate indifference, because he is the person who provides the treatment. If, however, the medical professional knows that his role in a particular medical emergency is solely to serve as a gatekeeper for other medical personnel capable of treating the condition, and if he delays or refuses to fulfill that gatekeeper role due to deliberate indifference, it stands to reason that he also may be liable for deliberate indifference from denying access to medical care.[7]

Nothing Campbell did remotely constituted "treatment that is responsive to the symptoms" as Defendant maintains. Motion, p. 5. He knew that Tanner had a recent fever

---

[7] *Sealock v. Colorado*, 218 F.3d 1205, 1211 (10th Cir. 2000). In *Sealock*, a physician assistant failed to promptly send an inmate to the hospital in the face of non-explained chest pains. Denying summary judgment, the Tenth Circuit held: "[The physician's assistant] knew that unexplained chest pain posed a serious risk to appellant's health. Failure to summon an ambulance would have disregarded that risk, arguably constituting deliberate indifference to a serious medical need*." Id.* at 1211–12.

over 105, very low blood oxygen levels, diminishing lung sounds, and was seen by two nurses who wanted him sent out. Whether or not he ordered oxygen treatments is utterly irrelevant. "The inquiry under a gatekeeper theory is not whether the prison official provided *some* care but rather whether they fulfilled their sole obligation to refer or otherwise afford access to medical personnel capable of evaluating a patient's treatment needs when such an obligation arises." *Lucas v. Turn Key Health Clinics, LLC*, 58 F.4th 1127, 1139 (10th Cir. 2023). Maintaining Tanner in a facility unable to treat him constitutes a classic case of deliberate indifference. As Dr. Beuther opined (**Ex. 3**, p. 5):

> This is not standard of care, rational, or reasonable in any care setting. Highest on the differential was pneumonia. Any clinic or urgent care provider would have at least given him antibiotics in the absence of a timely x-ray. Even had the wrong antibiotics been given, it would have at least indicated an intent to treat, but nothing in the record I have seen shows an intent to treat or try to treat the underlying cause of Mr. Tanner's illness.

As this Court held in denying Defendants' motion to dismiss, there is also no question that "[i]t is . . . clearly established in this circuit that a delay in medical care constitutes an Eighth Amendment violation where the plaintiff can show the delay resulted in substantial harm." *Kellum v. Mares*, 657 F. App'x 763, 767-68 (10th Cir. 2016) (*citing Mata*, 427 F.3d at 751). The Tenth Circuit consistently makes clear that regardless of the "factual contexts that differ," it is "clearly established that 'disregarding [an inmate's] severe symptoms amount[s] to a constitutional violation." *Paugh v. Uintah Cty.*, 47 F.4th 1139, 1169 (10th Cir. 2022) (citing cases). Campbell's deliberately indifferent refusal to hospitalize Tanner for over six hours, delayed treatment and caused him significant suffering and to lose significant portions of his hands and feet.

WHEREFORE, Plaintiff requests the Court deny Defendant Campbell's Motion.

Respectfully submitted this 26th day of June 2023.

| | |
|---|---|
| */s/ Anna Holland Edwards* | */s/ Matthew R. Laird* |
| Anna Holland Edwards | Matthew R. Laird |
| Erica T. Grossman | Isobel S. Thomas |
| Dan Weiss | THOMAS KEEL & LAIRD, LLC |
| Rachel Kennedy | 950 S. Cherry Street, Suite 312 |
| John Holland | Denver, CO 80246 |
| HOLLAND, HOLLAND EDWARDS & GROSSMAN, LLC | mlaird@thomaskeel.com |
| 1437 High Street | *Attorneys for Plaintiff* |
| Denver, CO 80218 | |
| anna@hheglaw.com | |
| *Attorneys for Plaintiff* | |

## CERTIFICATE OF SERVICE

I hereby certify that on the 26th day of June, 2023, the foregoing was filed using the CM/ECF system. I hereby certify I will send electronic notification of said filing to the following recipients.

| | |
|---|---|
| Matthew R. Laird | Gordan Vaughn |
| Isobel S. Thomas | Ann Smith |
| THOMAS KEEL & LAIRD, LLC | VAUGHAN & DEMURO |
| mlaird@thomaskeel.com | gvaughan@vaughandemuro.com |
| ithomas@thomaskeel.com | asmith@vaughandemuro.com |
| *Attorneys for Plaintiff* | *Attorneys for Defendant Campbell* |
| | |
| Debra DeRee | Andrew Katarikawe |
| Jennifer White | Gregory Whitehair |
| PATTERSON RIPPLINGER, P.C. | COLORADO ATTORNEY GENERAL'S OFFICE |
| dderee@prpclegal.com | Andrew.katarikawe@coag.gov |
| jwhite@prpclegal.com | Greg.whitehair@coag.gov |
| *Attorneys for Defendant Mannon* | *Attorneys for Defendant Shkolnik* |
| | |
| Lindsey Jay | |
| Scott Neckers | |
| OVERTURF MCGATH & HULL, P.C. | |
| lwj@omhlaw.com | |
| san@omhlaw.com | |
| *Attorneys for Defendant Culleyford* | |

*/s/ Brooke Thiele-LaForest*
Brooke Thiele-LaForest, Paralegal